2016 IL App (1st) 152479

FIFTH DIVISION
May 13, 2016

No. 1-15-2479

| | | |
|---|---|---|
| *In re* J.L., M.L., and A.L., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minors-Appellees | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Nos. 13 JA 816 |
| Petitioner-Appellee, | ) | 13 JA 817 |
| | ) | 13 JA 818 |
| v. | ) | |
| | ) | |
| Mario L., | ) | Honorable |
| | ) | Robert Balanoff, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Gordon and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Mario L. (Mario)[1] appeals from (a) adjudication orders entered by the circuit court of

Cook County finding that he abused and neglected three of his minor children and (b) a

disposition order finding him unfit and adjudging the children wards of the court.  Mario

contends that the trial court's finding that his younger daughter was sexually abused was against

the manifest weight of the evidence "because it was based on inadmissible hearsay evidence

regarding statements made by" his older daughter.  He also argues that his due process rights

---

[1] In the interest of confidentiality, we refer to certain adults by their first names and minors by
their initials.  The case caption has been amended accordingly.

were violated because "he was denied the right to defend himself against the allegations and subsequent findings of sexual abuse against" the older daughter (C.L.). The Office of the Cook County Public Guardian (the Public Guardian) and the State assert that the findings were supported by the manifest weight of the evidence and that Mario's due process rights were not violated.

¶ 2    For the reasons discussed below, we affirm the orders of the circuit court.

¶ 3                                I.  BACKGROUND

¶ 4    Araceli C. (Araceli) is the natural mother of:  (a) M.O., a daughter (born in 1995); (b) Y.C., a daughter (born in 1998); (c) C.L., a daughter (born in 2000); (d) M.L., a son (born in 2004); (e) A.L., a daughter (born in 2006); and (f) J.L., a son (born in 2008).  Mario is the natural father of C.L., M.L., A.L., and J.L.; he is not the father of M.O. or Y.C.

¶ 5                          A.  The Prior Proceedings

¶ 6    In July 2012, the Illinois Department of Children and Family Services (DCFS) was contacted regarding alleged sexual abuse of Y.C. by Araceli's live-in paramour.  At the time, Mario lived in Mexico.  Proceedings under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2012)) were initiated for each of Araceli's children referenced above.

¶ 7    In an adjudication order entered on February 27, 2013, in case number 12 JA 830, the court found, in part, that Y.C. "was sexually abused by mother's paramour."  In case number 12 JA 829, the court found that M.O. was abused and neglected, based on the sexual abuse of her sibling.  M.O. and Y.C. were adjudged wards of the court in disposition orders entered on the same date.

¶ 8    In an adjudication order entered in case numbers 12 JA 831 through 12 JA 834 on February 27, 2013, Mario's four children – C.L., M.L., A.L., and J.L. – also were found to be

abused and neglected based on the sexual abuse of their sibling (Y.C.). The order also stated, "Father was non-custodial at all times relevant." Mario represents that he moved to Chicago after February 27, 2013. In a disposition order entered on March 29, 2013, Araceli was found to be unable to care for the children, and Mario was deemed fit and was awarded custody of his four children. According to the Public Guardian, the circuit court closed the cases of M.L., A.L., and J.L. in June 2013; C.L.'s case remained open. Mario had custody of all four children at that time.

¶ 9                               B. The Commencement of the Current Cases

¶ 10    On August 28, 2013, the State filed three petitions for adjudication of wardship: for J.L. (13 JA 816); M.L. (13 JA 817); and A.L. (13 JA 818). The adjudication and disposition orders entered in these three cases are the subject of the instant appeal.

¶ 11    The petition for A.L. alleged, in part:

"Minor disclosed to law enforcement and medical personnel that her father had touched her with his penis on her vagina and buttocks. Minor's sibling disclosed to medical personnel that her father touched her breasts and vagina on August 23, 2013. Minor's sibling stated that father was intoxicated at the time and that she has observed father drinking in the past. Minor and her sibling both stated that father hits their siblings and pulls their ears and hair."

¶ 12    The petition alleged that A.L. was (a) neglected based on an injurious environment (705 ILCS 405/2-3(1)(b)[2] (West 2012)); (b) abused based on "a substantial risk of physical injury to such minor by other than accidental means" (705 ILCS 405/2-3(2)(ii) (West 2012)); and (c) sexually abused (705 ILCS 405/2-3(2)(iii) (West 2012)). In the petitions for adjudication of

---

[2] Certain statutory citations within the minors' petitions were inaccurate. For example, A.L.'s petition references "0702 405/2-3(1)(b)."

wardship filed for J.L. and M.L., the State alleged neglect-injurious environment and abuse-substantial risk based on the same allegations as set forth in A.L.'s petition.

¶ 13    On August 28, 2013, the court appointed separate attorneys for Araceli and Mario. The Public Guardian was appointed as the attorney and guardian *ad litem* for the children. The court awarded temporary custody of the children to the DCFS guardianship administrator. Araceli was granted supervised day visits; Mario was denied visits. Mario's sister, Abigail L., subsequently became the children's foster parent.

¶ 14                    C.  Notice to Compel Appearance of C.L. at Trial

¶ 15    On March 20, 2015, Mario filed a notice to compel the appearance of C.L. at the adjudication hearing scheduled to begin on April 15, 2015, pursuant to Illinois Supreme Court Rule 237(b). Ill. S. Ct. R. 237 (eff. July 1, 2005). The notice was filed in the cases of Mario's four children, including C.L.'s case (12 JA 831). C.L., through the Public Guardian, moved to quash the notice. The motion to quash provided, in part:

> "8.  [C.L.] has been through several foster homes and psychiatric
> hospitalizations. She has a history of mental health issues that include
> hallucinations. Her previous diagnoses include ADHD, Mood Disorder,
> Depression, and Sex abuse victim [*sic*].
>
> 9.  Upon information and belief, [Mario], through his attorney(s) intends
> to have [C.L.] testify to any knowledge of [A.L.'s] sexual abuse by him and/or her
> mother's paramours, and any other allegations in the petitions.
>
> 10.  Given [C.L.]'s history of mental illness, efforts have been made to
> address the need, or lack thereof, for [C.L.'s] testimony. A proposed stipulation
> of [C.L.'s] possible testimony was requested. However, [Mario], through his

attorney(s), has rejected those efforts."

After discussing the court's "duty to act in the best interests of the minor and for the minor's own protection," the Public Guardian asserted:

"It is not in the best interest of [C.L.] to be required to be present and testify at the adjudicatory hearing for her siblings. [Mario's] request does not indicate any compelling reason to demand [C.L.'s] presence or testimony in her siblings' case. At the present time, [C.L.] is doing well in school. She is mentally stable. She is stabilized to the point that her attending psychiatrist took her off all psychotropic medications. Any testimony, if at all relevant, is miniscule at best. There are alternatives to forcing [C.L.] to testify. The need for her testimony is outweighed by risk of her becoming destabilized."

¶ 16    After hearing arguments, the trial judge concluded, "I don't think it's in the minor's best interest to have her come in here and testify at this point." The court indicated its willingness to "revisit" the issue, noting that "[i]f it comes to that point, we can stop, we can pause, we can talk about it and decide how we proceed." The court entered an order granting the Public Guardian's motion to quash "for good cause shown: best interest of the minor."

¶ 17                    D.  The Adjudication Hearing and Key Evidence

¶ 18    At the commencement of the adjudication hearing, Mario's attorney moved "to exclude any evidence that the minor [C.L.] gave an interview to Chicago police detectives, or that those detectives memorialized that interview or documented it." Counsel stated that "we've been told in the past there is no documented or recorded interview" by the "police or a victim sensitive interviewer of [C.L.]." The assistant State's Attorney (ASA) confirmed, "I don't have a victim sensitive interview recording" of C.L. She further responded that one of the witnesses, Lanese

Kincaid-Turner (Kincaid-Turner), "will testify she wasn't allowed to take notes" during C.L.'s interview and thus her "testimony is going to be limited to what she can recollect and what's noted in her DCP[3] packet." After some discussion, the court denied the motion *in limine*.

¶ 19                    1.  Testimony of Lanese Kincaid-Turner

¶ 20    Kincaid-Turner testified that she was a child protection specialist with DCFS who worked out of the Chicago Children's Advocacy Center (CCAC), addressing allegations of sexual abuse. According to Kincaid-Turner, the "report came in" in August 2013 with allegations of sexual molestation of C.L. and A.L. and "risk of harm" to M.L. and J.L. On August 26, 2013, C.L., M.L., A.L., and J.L. were evaluated at Stroger Hospital (Stroger). Based on "allegations of suicide," C.L. was transported to St. Elizabeth Hospital (St. Elizabeth) for mental health services.

¶ 21    Also on August 26, 2013, Kincaid-Turner, Araceli and a family advocate spoke regarding the allegations. Kincaid-Turner testified:

> "Mom talked about [C.L.] telling her that they did not go to therapy that Friday, I guess, and that the father had been out trying to find the boys bicycles, that he had been drinking that day, and that she slept in her father's bed with her siblings because she could not sleep in her bed. She talked about how the father came into the room and got into the bed with them, and that [C.L] told her that the father touched her breasts and her private [*sic*]."

According to Kincaid-Turner, Araceli "talked about not believing it" and "talked about how [C.L.] told her that when she said that about the father, [A.L.] also made allegations against the father, and that how she didn't believe anything occurred with [A.L.] as well."

---

[3] We understand that "DCP" refers to Division of Child Protection.

¶ 22    On August 27, 2013, a victim sensitive interview (VSI) in Spanish was conducted with A.L., who was seven years old.  A.L. sat with the forensic interviewer; Kincaid-Turner, the ASA and the police observed the interview through a two-way mirror.  On September 19, 2013, C.L. was interviewed by Kincaid-Turner, the police and the ASA; C.L. "did not have a recorded victim sensitive interview."  Kincaid-Turner testified that she was not permitted to take notes during the interview; she made a contact note regarding C.L.'s interview reflecting that C.L. "made a detailed disclosure about sexual abuse."

¶ 23    Referring to A.L., the ASA asked Kincaid-Turner, "Why did you end up indicating the parents or the father for the allegations that you did?"  Kincaid-Turner responded over objection that "it was indicated against the father because [A.L.] said that the father put his penis on her butt skin to skin."

¶ 24    Kincaid-Turner began to respond regarding the allegations involving C.L.; Mario's attorney objected.  Counsel referenced "C.L.'s detailed interview which we do not have any recorded documentation of" and "assert[ed] again our client's right to object and ask that that testimony be barred."  The court overruled the objection, and Kincaid-Turner testified:

> "[C.L.] said the father basically had been drinking that day, got into bed with her
> and her siblings.  They were all in his bed.  And, she felt her father touching –
> touching her body.  She felt him come behind her.  And, then he touched her
> breasts and her vagina."

According to Kincaid-Turner, "[r]isk of harm was indicated for the boys because of the incidents that occurred with the girls.  And, *** all kids were present during the abuse."

¶ 25    The court questioned Kincaid-Turner regarding "all four children *** sleeping in the father's bed."  Kincaid-Turner responded, "She said they were in the bed because in their room

they had bedbugs." Kincaid-Turner subsequently testified that she did not go to Mario's home as part of her investigation; she did not verify whether there were bedbugs or check the sleeping arrangements.

¶ 26    On cross-examination, Mario's attorney questioned Kincaid-Turner regarding the prior indicated report against Araceli. Kincaid-Turner testified that the report indicated "sexual penetration" and Araceli's "failure to protect and allowing her then paramour, a sex offender, back into home with access to the children." The children were placed in foster care and then returned to Mario. Kincaid-Turner confirmed that in the VSI of A.L., she "says she was abused by her father." Mario's counsel then asked, "At Uncle Julio's house?" Kincaid-Turner responded, "I can't remember exactly what house, but I know it was not the home of the father." Kincaid-Turner did not interview or go to the home of "Uncle Julio," his wife "Aunt Carmen," or their children.

¶ 27    Kincaid-Turner further testified on cross-examination that A.L. was examined by Dr. Marjorie Fujara (Fujara) at Stroger; Fujara works for the CCAC medical unit. The examination was "normal," revealing no physical evidence of sexual penetration. Fujara also examined M.L. and J.L. Neither M.L. nor J.L. disclosed any physical or sexual abuse to Fujara; Kincaid-Turner confirmed their examinations were "normal."

¶ 28    Mario's attorney cross-examined Kincaid-Turner regarding her conversation with Araceli on August 26, 2013. Kincaid-Turner confirmed that Araceli told her that "it's very difficult for her to believe [C.L.'s] allegations that her father had sexually abused her." Araceli also told Kincaid-Turner that "she did not believe this because she knows [C.L.] liked it better in the foster home" and that C.L. "had more freedom with the foster parent." Araceli told Kincaid-Turner that [C.L.] "will do anything to get out of the home with [Mario]."

¶ 29 Kincaid-Turner testified that C.L. "had to be hospitalized" for suicidal ideation during the investigation of the sexual abuse allegations. Mario's attorney asked, "[D]id you discover during the course of your investigation that [C.L.] had previously been psychiatrically hospitalized?" Kincaid-Turner responded, "No." She later clarified that she "didn't know any details" although she knew "that there was something that happened to the child in the past and there may have been some issues."

¶ 30 Kincaid-Turner spoke with Mario on August 28, 2013; he told her he had been having problems with C.L. During a telephone conversation two days earlier, Mario also stated that he was having problems with C.L. and that C.L. "had said she wanted to kill herself two different times." He told Kincaid-Turner that he would cooperate with the investigation and that he was worried about his children.

¶ 31                     2. Stroger and St. Elizabeth Medical Records

¶ 32 After Kincaid-Turner's testimony, the State sought to enter various exhibits, including the prior adjudication and disposition orders, Mario's children's medical records from Stroger, and C.L.'s medical records from St. Elizabeth. There were no objections, and the exhibits were entered into evidence.

¶ 33 During M.L.'s examination at Stroger on August 26, 2013, Dr. Fujara spoke with M.L. and a family advocate. Fujara noted that M.L. "appeared guarded throughout the interview." According to the medical report electronically signed by Fujara, M.L. denied that any person "was ever mean to him," hit him, or touched his "private part" and buttocks. The report indicates, "When asked if anyone drinks in the house, he said, 'just jugo or agua … orange juice.' When questioned about "what his sisters' said [*sic*]" at Stroger, he said, '[C.L.] lies, my dad is nice.' " Fujara spoke with J.L. at Stroger on the same date; he also denied "that anyone was ever

mean to him," being hit, or that anyone had touched his "private part" and buttocks. When Fujara asked "what happens to him when he gets in trouble, he said, 'my dad makes me face the wall.' [J.L.] demonstrated by standing 6 inches away facing the wall."

¶ 34    Dr. Elena Strunk (Strunk) examined A.L. at Stroger, also on August 26, 2013. Strunk's notes include the following:

>"The patient presents with patient's 13 year old sister reports [*sic*] that her sister ([A.L.]) told her that her father touched her in her genitals a couple of days ago. Now, [A.L.] denies these reports. She has no complaints and is sitting with her sister comfortably. She denies any genital touching of her father at this time. *** Dr. Lorand with Child Protective Services was called and is now seeing the 2 sisters with her team."

Notes written by Dr. Michele Lorand (Lorand) on the same date provide, in part, as follows:

>"When asked why she is here, [A.L.] said, 'Because something happened at home.' [W]hen asked what happened she said, 'My dad touched me.' When asked where he touched her, she pointed to her genital area. When asked what he touched her with she pointed and again [*sic*] to her genital area and said, 'With what he pees with.' [A.L.] explained, 'I was in my bed.' 'My clothes were on.' 'His clothes were on.' 'He went under my clothes.' [W]hen asked how many times this happened she said, 'one.' [A.L.] said 'I told my sister.' When asked if her father ever hit her, she grabbed her [*sic*] and pulled it and said, 'He does like this.' "

¶ 35    Strunk examined C.L. at Stroger on August 26, 2013. According to Strunk's notes, C.L. stated that "her dad touched her private parts over 48 hours ago after he was drinking." C.L. also

reported that A.L. was touched by Mario. Lorand evaluated C.L. at Stroger on the same date; her notes provide, in part:

> "[C.L.] said that she is here 'Because my father touched me.' 'He was drinking in another room and I went to sleep in his bed and I was asleep and I woke up and I felt a hand down my shorts in back, so I just kicked because I thought one of my brothers was playing and turned over and then my dad put his arms around me like he was going to hug me and that's when he touched me on my breasts and here (pointed to genital area.) [C.L.] said it was 'over my clothes,' and that this happened 'once this past Friday.' (8/23). When asked who she told, she said, I told my little sister, [A.L.] on Saturday and then I told [Y.C.] who told her foster mother who told my therapist. [C.L.] denied her [father] saying anything at that time, but said 'he gave me $10 the next morning before I went to go visit my sister and he never did that before.' [C.L.] said that when she told her little sister, [A.L.], her little sister said the same thing had happened to her and that her father had put his private part on hers, but then denied it. *** [C.L.] denied that anyone else had everdone [*sic*] anything like this to her."

According to Lorand, C.L. indicated that her father "wasn't supposed to drink when we went to live with him, but he started again." C.L. also stated, "He pulls my little brother's and sister's ears and hits them and pulls their hair."

¶ 36    C.L. was the subject of a psychiatric consultation by Dr. Deborah Matek (Matek) at Stroger on August 26, 2013, because C.L. had stated "that she had been feeling like she could not bear to go on living starting three days ago." Matek's notes include the following:

> "The [patient] has experienced a series of sexual abuses and physical abuses. She

11

was reunited with her father a while ago along with her two brothers and her sister. Then about three days ago, when he had been drinking, [Mario] fondled [C.L.] sexually as she slept. This woke her and she moved to a different sleeping location, after pushing him away. She also checked on her sister to be sure she was not being fondled."

C.L. reported to Matek that "once before she was psychiatrically hospitalized." Due to current suicidal ideation, C.L. was transferred from Stroger to St. Elizabeth for mental health services.

¶ 37    The record on appeal includes hundreds of pages of medical records for C.L. from St. Elizabeth. C.L. initially was hospitalized at St. Elizabeth from August 26, 2013, to September 10, 2013. She reported, among other things, that Mario "touched my private part." The "[f]inal diagnosis" included on her "Psychiatric Discharge Summary" included major depression and "problems with primary support group and sexually abused by her father." C.L. was readmitted to St. Elizabeth on December 11, 2013, through January 7, 2014. In the description of the reason for hospitalization, the psychiatric discharge summary provides, in part, that C.L. "reports that her family members do not believe that her father sexually abuse her [*sic*]." During a third admission to St. Elizabeth from January 14, 2014, to February 7, 2014, C.L.'s final diagnosis included "[b]ipolar, mixed." After "juvenile detention for 2-3 weeks" following her arrest for "fighting a female peer at her group home," C.L. was again hospitalized in St. Elizabeth from July 14, 2014, through July 21, 2014.[4] St. Elizabeth records indicate that C.L. reported auditory hallucinations commanding "harm to self and others." C.L's discharge diagnosis included "PTSD," posttraumatic stress disorder.

---

[4] A notation in C.L.'s medical records from July 14, 2014, indicates that she "was previously [admitted] to this facility for depression in March 2014." However, the record on appeal does not contain medical records relating to a March 2014 hospitalization for C.L.

¶ 38                                3.  Testimony of Venus Cole

¶ 39    Venus Cole (Cole) testified during the adjudication hearing that she was a child protection specialist for DCFS; as a "mandate investigator," her responsibilities were "[t]o meet emergency mandates only."  When asked about the procedures for interviewing alleged victims of sexual abuse, she responded that "we can interview them, but once they begin to talk, if they're talking about it, they can freely talk.  However, I'm not supposed to ask them any forwarding questions or leading questions."  She explained that the children "are eventually going to have a victim sensitive interview at a professional location."

¶ 40    On August 24, 2013, Cole had a conversation with A.L. at a former foster parent's home.  Cole told A.L. "who I was and why I was there."  A.L. began to tell Cole "that she told her sister what happened to her."  Cole asked A.L. whether she had spoken with anyone else regarding the matter; A.L. said she told "Mimi."  According to Cole, "Mimi" was the former foster parent.

¶ 41    When asked which sister A.L. had "told that something had happen[ed]," Cole responded, in part, "It wasn't [Y.C.].  But she told [Y.C.].  *** And, she told the other sister that was with her, I do believe, which was [C.L.]."  Y.C. was living in the home of the former foster parent when Cole was present.  Responding to questions regarding A.L.'s physical condition, Cole testified that A.L. had "bites all over her" that "appeared to be human bites."

¶ 42    Cole also spoke with C.L. on August 24, 2013, at the home of the former foster parent; C.L. was approximately 13 years old.  According to Cole, C.L. "stated that she had bedbugs in her bed, and she went and got in the bed with her dad, and he had been drinking, and he began to touch her."  Cole later asked C.L. whether she had spoken with anyone, and "she said she told her sister, she told Mimi, and she told her worker."  C.L. told Cole that she had lived at Mimi's house for approximately five months before she "went back to her dad."  C.L. also told Cole that

Mario "likes to drink" and that he "drinks with her aunt's son who lives across the street." According to Cole, C.L. stated that "[s]he couldn't stay with relatives because she was afraid to stay with her aunt because her dad would just only come across the street and kick the door in."

¶ 43     The ASA asked Cole, "When you were speaking with [C.L.], did she tell you anything about the allegations regarding [A.L.] that you were investigating?"  Cole responded, "That her sister told her those things." The ASA then asked, "Was [C.L.] specific as to when she was told by [A.L.] of the allegations?"  Cole responded:

> "Not that I recall.  All I remember is that she told her that when her sister came to visit, she has talked to her in the past, and she never believed her sister because her sister would always tell her what was going on, and turn around and change her story.  She said so I never believed my sister until today.  And, I asked her why did you believe her today.  She say because the same thing she described I told her has happened to me."

Upon questioning by the court, Cole clarified that the "sister" was A.L.

¶ 44     Cole further testified that C.L. had stated "[t]hat her dad touched her, got in the bed, touched her on her butt and was feeling on her.  And, he was drunk at the time he was touching her.  And, she stated that her little sister said that the same thing happened to her, that he touched her, and he told – that's when they both told Mimi what took place."

¶ 45     Mario's attorney cross-examined Cole regarding a note she wrote concerning her conversation with C.L.  Cole confirmed that "[n]owhere in this note does it give any details about such as what [Cole] was testifying to regarding [Mario] touching [C.L.] in certain places." Cole also confirmed that C.L. had told her that C.L. "reported her allegation of sexual abuse first to her sister [A.L.]" and then "[C.L.] went on to tell [Cole] that after she told [A.L.] that

something had happened to her, [A.L.] said the same thing happened to her." Responding to questions from the court, Cole testified that C.L. "didn't really say" exactly when "this had happened to her." According to Cole, C.L. "didn't say how far in the past, she said in the past." During cross-examination by Araceli's attorney, Cole stated that C.L. told her that A.L. "[i]n the past told [C.L.] some things have happened. And, she said she would believe her at first, and when she would go to tell someone, [A.L.] would change her story" about "being touched." Cole also confirmed that "[Y.C.] had stated that [A.L.] had changed her story about things." Cole further testified that Y.C. told her that C.L. had said that "she had been touched by her dad."[5]

¶ 46                          4. Testimony of Jasmine Alvarez

¶ 47    Jasmine Alvarez (Alvarez), who is bilingual, was employed by Aunt Martha's Shelter (AMS) from February 2013 until August 2014. As part of her responsibilities in supervising visitation with Spanish-speaking families, she would create a "visitation record." When asked about the "normal" contents of such a record, she responded, "Just observing the visit, anything that's discussed that's not appropriate." Two documents entitled "DCFS Visiting Record" were admitted into evidence – one from September 1, 2013, and the second from September 5, 2013. Araceli and an "aunt/cousin" were present for both visits; Alvarez did not know whether the "aunt/cousin" was related to Mario or Araceli.

¶ 48    In the visitation notes from the September 1 visit, Alvarez wrote, in part, "I heard the [a]unt/cousin telling [M.L.] that his father loves him and that they know his father would not try

---

[5] The court initially struck from the record "the entire conversation that *** Cole had with [Y.C.]" after a hearsay objection by Mario's counsel regarding a conversation between Y.C. and C.L.; the court later allowed such testimony by Cole. Although Mario's counsel did not expressly object to the court's decision to allow the testimony, counsel inquired regarding the basis for the decision and argued that Y.C. was "not a party to this second action." The court indicated its "understanding of the case law is that you can introduce discussions with children in a family who are not actually – have any involvement with the juvenile court system."

to hurt them, but I interrupted them and explained that the conversation was not allowed." In her notes from September 5, 2013, Alvarez wrote, in part, "Clients mother [*sic*] was having a conversation with daughter [A.L.] about the fathers allegations [*sic*], I explained to the family that the conversations were not allowed."

¶ 49                    5. Testimony of Rebekah Stevenson

¶ 50    Rebekah Stevenson (Stevenson), a bilingual forensic interviewer with CCAC, testified that she conducts forensic interviews in English and Spanish "with children who are alleged victims of sexual abuse, children from 2 to 17 years old." During her five years with CCAC, she conducted more than one thousand forensic interviews. Discussing the procedures at CCAC, she explained that "[a]ll forensic interviews are video and audio recorded." Prior to an interview, Stevenson is "given a brief statement of the allegation by the team members," who are "[t]he detective from the Chicago Police Department assigned to the case, a DCFS worker if they are assigned to the case, and an assistant State's attorney." The team members assigned to the case observe the interview through a two-way mirror; only Stevenson and the child are in the interview room.

¶ 51    On August 27, 2013, and on January 22, 2014, Stevenson conducted forensic interviews of A.L. in Spanish. Two discs containing recordings of the interviews – and written transcriptions of the interviews translated into English and reviewed and corrected by Stevenson – were admitted into evidence.

¶ 52                    6. Victim Sensitive Interview of A.L. on August 27, 2013

¶ 53    During the VSI of A.L. on August 27, 2013, after preliminary questions, Stevenson asked A.L., "Did something happen to you?" A.L. responded, "Mmm – my father touched me and my sister." Stevenson asked A.L. where her father touched her. A.L. stated, "Where you do pee-

pee" and indicated her genital area. A.L. also answered that her father touched her "with what he makes pee-pee with." A.L. stated that this happened one time, in her house, while her brothers were sleeping. A.L. stated her father "got on top of" her when she was sleeping. Both of them were clothed; he removed her underwear and touched her under her dress. She felt, but did not see, his "dessy," *i.e.*, his "private part."[6] A.L. described her father's "dessy" as feeling "[f]labby." When Stevenson asked, "in what room were you in," A.L. responded, "we slept – we were in my uncle Julio's house and we always sleep in my father's room." A.L. told Stevenson that her brother M.L. was in the bed but did not see what their father did because "he was sleeping."

¶ 54    In response to questions from Stevenson regarding where her father touched her, A.L. indicated that her father had touched her with his "dessy" on her buttocks and vaginal area. Stevenson later asked A.L., "when he touched on your butt on in this part of where you do pee-pee – was his body moving or was he still?" A.L. responded, "It moved." Stevenson then asked, "How did it move?" The transcript indicates that A.L. answered, "When – like doing like this (indicating)." The recording shows A.L. moving her right arm back and forth.

¶ 55    A.L. stated that after her father touched her, he also touched her sister. A.L. did not see the touching but answered that "[s]he told me about it." When asked, "Where was your sister?," A.L. responded, "well went [*sic*] to sleep at my – my Uncle Julio's house – *** and later we went to my father's house." A.L. said that "[C.L.]'s bed had like bugs *** and my father was check it [*sic*] and she said she was already sleepy and she went to sleep in his bed." At that point, A.L. was sleeping in another bed in her uncle's room.

¶ 56    A.L. told Stevenson that, after her father touched her, she told C.L.; C.L. told A.L., "you want to hear something and what happened to her." C.L. told A.L. that she felt someone touch

---

[6] Stevenson testified that, in her experience, "dessy" refers to a person's "[p]rivate part."

her, and "she hit – and she kicked him in the face." The person C.L. kicked was her father.

¶ 57 Discussing A.L.'s father, Stevenson asked, "Has he ever done any – any other bad things to you?" A.L. responded, "No." A.L. then stated that he "pulls our ears" if he "gets mad" and hits M.L. with his sandal on his buttocks or arm. A.L. told Stevenson that her father "hasn't hit my sister but she gets mad when he puts us in." A.L. explained that "when we are outside – like every day we're are bored [*sic*] in the house and he comes home from work and he's always tired – *** he goes to bed to sleep and [C.L.] says, we want to go outside but (inaudible) and my father said, talk right to me." Referring to C.L., A.L. continued, "but she talked right to him and she got mad and went outside."

¶ 58 A.L. answered that "uncle Julio" was not in the house when her father touched her. She stated that Julio had one girl and two boys and told Stevenson their names. The children were present when A.L. was touched by her father, "but they were in their rooms." Julio's wife Carmen also was in the house, "sleeping with *** uncle Julio." Stevenson asked A.L. why she was sleeping in Julio's house and not her father's house. A.L. responded, "Because – hmm – because my father didn't love my mother." She then said, "[a]nd we do love our mother and (inaudible) go – go – (inaudible) only with – with him (inaudible) and he left my mother there in the house."

¶ 59                      7. Victim Sensitive Interview of A.L. on January 22, 2014

¶ 60 During the VSI of A.L. on January 22, 2014, Stevenson asked A.L. "what did you come to talk about today?" A.L. responded, "About a man – my mother's boyfriend did something to me." A.L. said the man's name is "Javier." A.L. initially said she "was still seven" when it happened, but then stated, "I don't know – five or six." She said something happened "[o]ne time." A.L.'s mother took her to her uncle Julio's house because she had to work. Julio and his

wife and children were at the house, along with "[t]he man," Javier. According to A.L., Javier was staying at Julio's house; Javier was Araceli's boyfriend.

¶ 61    A.L. told Stevenson that Javier "went to the bed where I was sleeping with [M.L.]. Then he got on top of me." A.L. stated that Javier touched her on her "private part" with "his part." A.L. told Stevenson that his "private part" felt "[l]ike – wet." Responding to questions from Stevenson, A.L. stated that Javier touched her "[o]n the skin" and "[i]n the hole"; she said, "I felt it was hurting me." She told Stevenson that he was "breathing differently." According to A.L., M.L. and J.L. did not see what happened because they were sleeping.

¶ 62    On "[a]nother day," A.L. told her mother what had occurred. She waited to talk to her mother because she was "scared." A.L. stated, "I thought she was going to scold me." Answering questions from Stevenson, A.L. indicated that she thought she "told C.L. first." When she told C.L., C.L. said "that someone did the same thing to her." A.L. could not remember whether C.L. told her "who did that to her."

¶ 63    Stevenson asked, "I know that you were here some months back and the last time that we were here what did we talk about that time?" A.L. responded, "Uh – I don't remember." Referring to the prior VSI, Stevenson asked, "you told me that something happened with your father. Is that correct or not?" A.L. answered, "Uh-huh." Stevenson asked A.L. why she did not "say anything about what happened with Javier" during the prior visit. A.L. stated that she was "scared" but did not know why she was scared.

¶ 64    Discussing the incident with Javier, Stevenson asked why Javier was at "uncle Julio's house when this happened." A.L. responded, "Because my mother always needed to go to work." The following exchange subsequently took place between Stevenson and A.L.:

    "Q. Okay, okay uhm – and we talked about what happened with Javier and you

told me uhm – the last time you were here that something happened with your father, Mario Alberto. Has any other person done something to you or touched you in a part of your body?

A. (Indicating).

Q. No, okay. So Javier and your father. Has any other person done anything to you?

A. No.

Q. No, okay.

A. My father has never done anything to me just (inaudible). My sister says that he's done something.

Q. Your father Beto hasn't done anything to you. Just your sister is saying that he's done something?

A. Hmm-hmm."

At the conclusion of the interview, Stevenson asked, "Javier is your mother's boyfriend and \*\*\* your father is called Mario Alberto. Is that correct?" A.L. indicated that that was correct and that Javier did not have another name.

¶ 65                                  8. Testimony of Abigail L.

¶ 66    After an opening statement by Mario's counsel, Abigail L. (Abigail), Mario's sister, testified on his behalf. Abigail was the foster parent for M.L., A.L., and J.L. – but not C.L. – for "less than a year" beginning in October 2013. In December 2013, A.L. started a conversation with Abigail; Abigail's sister, Bernicia, also was present. A.L. asked Abigail when the case would be "over" and why the case was happening. Abigail told A.L. that they could not talk about the case and "[h]opefully soon so you could be either with your mom or your dad."

¶ 67    Abigail testified that A.L. then "asked me if she could tell me something."  According to Abigail, A.L. "told me her dad, Mario, had not done anything to her, that something did happen to her."  Abigail testified that A.L. told her that her mother went to work and left M.L., J.L., and A.L. with "Javier."  After A.L. urinated in her bed, she went to tell Javier and then returned to sleep.  Abigail testified that A.L. "woke up when someone was touching her."  A.L. told Abigail that Javier had "touched her private parts."  According to Abigail, A.L. had told her that these events occurred when "they lived with their mother."  When asked about the "man's name," Abigail answered that A.L. "referred to him as my dad, Javier."  A.L. also told Abigail that she had told her mother and then [C.L.] about the incident with Javier.  A.L.'s conversation with C.L. occurred "on the way to [Y.C.]'s house."  A.L. and C.L. then told Y.C. about the incident.  A.L. told Abigail that she visited with Y.C. when "[t]hey lived with their father."

¶ 68    Abigail testified that Julio R. (Julio) is a relative of Araceli.  Abigail met Julio in Mexico but did not have any contact with him in Chicago.  Abigail never met Julio's wife, Carmen.  Abigail stated that Mario "hasn't been" to Julio's house and "they've never had a relationship, like, a friendship."

¶ 69    Abigail further testified that A.L. spoke with her about C.L. in late spring of 2014;[7] Bernicia was present.  A.L. told Abigail that "she wasn't comfortable" with C.L.  "If [A.L.] didn't do what [C.L] told her to do, she would get mad or sometimes would hit them."  During cross-examination by Araceli's counsel, Abigail testified that on one occasion, C.L. called Abigail's mobile telephone to speak with A.L.  According to Abigail, "[A.L.] did not want to talk to her. She just started crying and said, I do not want to talk to her."

¶ 70                    9.  Hartgrove Hospital Records

---

[7] Mario's counsel referenced "May of 2013," but the record otherwise indicates that the conversation took place in 2014.

¶ 71     Mario sought admission of C.L.'s medical records from Hartgrove Hospital (Hartgrove). The assistant public guardian (the APG) and the ASA objected based on the timing and relevance of C.L.'s hospitalization at Hartgrove, which was "two and a half months prior to the DCFS investigation starting."  The court overruled the objections, and the records were admitted.

¶ 72     On May 21, 2013, C.L. entered Hartgrove reporting depression and suicidal thoughts. C.L. said that she had cut herself approximately one year earlier, but had not received medical attention for such cutting.  The records indicate that C.L. had been receiving outpatient therapy with a DCFS social worker and was reportedly having difficulty transitioning to living with Mario.  In her "Psychosocial Assessment," C.L.'s "perception of reason for hospitalization" included, "I argue the fact that I am with my Dad and not with my mother."  According to the assessment, C.L. described her relationship with Mario as "kind of good."  The assessment further provided that C.L. "reports that Dad does not know how to take care of all the kids and therefore she is overwhelmed."  On the date of her discharge (June 4, 2013), C.L. said "she doesn't want to go back with her father and she is unable to go back and live with her mother and unable to pinpoint a good reason why she doesn't wish to go live with her father."  Her discharge diagnosis included major depression.

¶ 73                                        10.  Closing Statements

¶ 74     During closing statements, the State argued that A.L.'s statements regarding her sexual abuse by Mario were corroborated in two ways:  (1) "[A.L.'s] statements herself that she made throughout the investigation including her statements in the forensic interview"; and (2) "corroboration through sibling statements."  As to the January 22, 2014, VSI of A.L., the State "asked [the] Court to consider the strong possibility that [A.L.] may have been sexually abused on multiple occasions, not only by her father but also mother's former boyfriend, Javier."

The court asked the ASA about A.L.'s denial of touching by her father when she was first interviewed at Stroger. Counsel responded that "that is just to one doctor in the emergency room." Conversely, the ASA argued, A.L. made statements regarding abuse when speaking with a "Child Protective Services doctor *** trained on how to *** deal with minors that come to the hospital where there are allegations of sexual abuse or physical abuse."

¶ 75    The Public Guardian adopted the State's arguments. The APG further stated that C.L. "made a detailed disclosure of the sexual abuse she endured from her father" during her interview with Kincaid-Turner on September 19, 2013. Counsel also referenced a "final diagnosis" from C.L.'s medical records at St. Elizabeth that she was sexually abused by her father. Discussing the "slight differences in the two VSIs," counsel stated that "[t]here are questions as to what the paternal side of the family could have or would have told [A.L.] regarding the case" and that during supervised visitation on September 5, 2013, Araceli was heard having a conversation with A.L. regarding the allegations. The court asked the APG whether "the second interview is *** different like the [ASA] suggested" or A.L. "was coached." Counsel responded, in part, "I think there are two different incidents." When the court asked about the incident described in A.L.'s second VSI, the APG stated, "Well, it could have happened while in the care of the father."

¶ 76    Mario's counsel argued that the State "failed to produce any corroborating evidence to support the allegations of sexual abuse." Counsel asserted that the State "produced no evidence that Mario *** was ever at Uncle Julio's house." In her second VSI and in her conversation with Abigail, however, A.L. discussed "Javier" and Uncle Julio's house. Mario's counsel also pointed out that A.L. denied any genital touching during her examination by the emergency room physician at Stroger. According to counsel, there were discrepancies regarding which sister

informed the other of abuse first: A.L. or C.L. Furthermore, counsel stated that Araceli indicated that "[C.L.] will do anything to get out of the home of the father." Arguing that "[t]here is no hard and fast rule about what constitutes corroboration of a child's previous statements of abuse or neglect," Mario's counsel distinguished cases cited by the State.

¶ 77    After making various arguments, Araceli's counsel "ask[ed] that the Court find that [Araceli] was noncustodial during the allegations of the specific petition that has been submitted to the Court and that there not be any other findings concerning the mother based on the second statements of the minor," presumably referring to A.L.'s statements during the January 2014 VSI.

¶ 78                          E.  The Court's Ruling and the Adjudication Orders

¶ 79    After "spen[ding] the last couple of days looking through the material, watching the videos, going through all the statements, rereading the transcripts," the court ruled:

> "The State has met its burden of proof by a preponderance of the evidence, and there is a finding of abuse substantial risk of injury and neglect injurious environment in relation to all three minors and in the sexual abuse of [A.L.]
>
> The support of this my decision is this: There are prior findings of abuse and neglect in relation to these minors.
>
> I find that the statement[s] of [A.L.], [C.L.] were credible and that there was no reason for either child to fabricate the statements and that there was no opportunity to arrange for the minors to give false statements.
>
> I also find the testimony of Ms. Kincaid-Turner, Ms. Venus Cole, and Rebecca Stevenson were credible.
>
> The US Supreme Court said it best when it was cited In re: Walter B. in 1992 when they stated, A child's statement of abuse or neglect should be deemed

24

sufficiently trustworthy, that adversarial testing can be expected to add little to their reliability.

The evidence shows that in August 2013, [A.L.] repeatedly told her sister [C.L.], the DCP investigator, doctors, social workers and the Victim Sensitive interviewer that her father had molested her. The story remained the same. The details did not change. Her statements during the VSI in August were credible and corroborated by the fact that she told many people the same simple facts.

[A.L.] did deny the molestation when first asked about it after being examined by the hospital emergency room doctor, but it was followed shortly thereafter by numerous reaffirmations of the molestation.

I also find that [A.L.'s] statement during the January 2014 VSI were credible as to the facts of the second molestation by Javier ***. The molestation occurred in a different bed, perhaps a different room by a different person, and different actions and responses by the molester. Additionally in the second molestation there was penetration. These facts are substantially different from the sexual molestation by her father.

[A.L.]'s statement that her father had never done anything to her, in the January statement, came five months after the initial report, and after she had been living with an aunt. I give this little weight because [A.L.] didn't recall even talking with Ms. Stevenson back in August. And I hope this is part of her therapy and that she is putting what happened to her behind her.

[A.L.] wasn't able to give a precise time frame, but it seems that she was in the custody of her mother. I find that [C.L.]'s statements of being molested by

her father are credible.

Immediately after she was molested she informed her sisters [A.L.] and [Y.C.], and shortly thereafter, the DCP investigator, therapist, a doctor and a social worker. These repeated statements corroborated that [C.L.] was molested by her father.

There's been no evidence presented that these molestations did not occur. Only the vague statements of a seven year old – statements that seven year olds sometimes don't tell the truth; something that all parents know.

The molestations of [A.L.] and [C.L.] by their father does not leave physical evidence that can be seen by an examination. And Illinois law does not require it because to require physical evidences in all cases would hinder the public policy that we want to protect our children from sexual assault.

In this case, there was no reason for the children not to be truthful, and there is no time frame of their statements to make it clear that there was no opportunity for fabrication."

¶ 80    In a written adjudication order entered on July 10, 2015, in cases 13 JA 816 and 13 JA 817, the court found neglect-injurious environment and abuse-substantial risk with respect to J.L. and M.L. The order provides that "[m]inors siblings [*sic*] disclosed their father sexually abused the siblings. Minors resided with their father at the time their siblings were sexually abused by their father." In an order entered on the same date in case number 13 JA 818, the court found neglect-injurious environment, abuse-substantial risk, and sexual abuse with respect to A.L. The order provides, in part, "Minor + her sibling stated that her father touched her on her private parts + on the butt." The order states that "NF" – the natural father – was the perpetrator of the sexual

abuse. Both adjudication orders indicate that the abuse or neglect was inflicted by a parent.

¶ 81                           F. The Dispositional Hearing

¶ 82    After a dispositional hearing on July 29, 2015,[8] the court entered a written disposition

order with respect to M.L., A.L., and J.L. finding both Araceli and Mario unable to care for the

children. The court also found Mario to be "unfit," and the children were adjudicated wards of

the court. Mario appeals from the adjudication and disposition orders.

¶ 83                                    II. ANALYSIS

¶ 84    Mario advances two primary arguments on appeal. First, he contends that the trial court's

finding that A.L. was sexually abused was against the manifest weight of the evidence. Second,

Mario asserts that his due process rights were violated because he "was denied the right to

defend himself against the allegations and subsequent findings of sexual abuse against [C.L.]."

We address each argument below.

¶ 85       A. Whether Sexual Abuse Finding Was Against Manifest Weight of Evidence

¶ 86    Mario argues that the trial court's finding that A.L. was sexually abused was against the

manifest weight of the evidence "because it was based on inadmissible hearsay evidence

regarding statements made by [C.L.], [Y.C.], [A.L.], and mother, lacked corroborating evidence,

and relied on prior court findings that had no relevance to this case." "Cases involving

allegations of abuse and neglect are *sui generis* and must be decided based upon their unique

facts." *In re Kenneth D.*, 364 Ill. App. 3d 797, 801-02 (2006). The State has the burden to prove

the allegations by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 463-64

(2004). We will not reverse a trial court's determination of abuse or neglect unless it is against

the manifest weight of the evidence. *In re An. W.*, 2014 IL App (3d) 130526, ¶ 55. A finding is

---

[8] Because Mario advances no substantive arguments regarding the dispositional order, we have not provided details regarding the dispositional hearing.

against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Arthur H.*, 212 Ill. 2d at 464. "When the manifest weight standard applies, the reviewing court will not substitute its judgment for that of the trial court on such matters as witness credibility, the weight to be given evidence, and the inferences to be drawn from the evidence, even if the reviewing court would have reached a different conclusion if it had been the trier of fact." *An. W.*, 2014 IL App (3d) 130526, ¶ 55.

¶ 87     Mario initially argues that A.L.'s uncorroborated statements are inadmissible.[9] The public guardian[10] responds that her "statements were certainly admissible – the Juvenile Court Act specifically states that a child's previous statements of abuse are admissible, but those statements cannot support an abuse finding if they are not subject to cross examination or supported by corroboration." We agree with the Public Guardian. "Section 2-18(4)(c) of the Act creates an exception to the general rule against hearsay and allows a minor's out-of-court statements relating to allegations of abuse or neglect to be admitted into evidence at a civil adjudicatory hearing to determine whether the minor is abused or neglected." *An. W.*, 2014 IL App (3d) 130526, ¶ 61. The section provides:

> "Previous statements made by the minor relating to any allegations of abuse or
> neglect shall be admissible in evidence. However, no such statement, if
> uncorroborated and not subject to cross-examination, shall be sufficient in itself to
> support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2014).

"In enacting section 2-18(4)(c), the legislature sought to balance the welfare interests of minors

---

[9] As discussed below, a trial court's decision to admit evidence is reviewed by this court for an abuse of discretion. *In re Alexis H.*, 401 Ill. App. 3d 543, 553 (2010).
[10] In its appellate brief, the State adopted the arguments of the Public Guardian and cited additional authorities. For purposes of clarity, we refer solely to the Public Guardian herein, unless the argument specifically was advanced by the State.

and the rights of those accused of abuse or neglect." *An. W.*, 2014 IL App (3d) 130526, ¶ 61.

¶ 88   Our supreme court has interpreted section 2-18(4)(c) to require either cross-examination or corroboration, but not both. *In re A.P.*, 179 Ill. 2d 184, 196 (1997).  "Thus, under section 2-18(4)(c), a minor's hearsay statement is sufficient in itself to support a finding of abuse or neglect if either: (1) the minor is subject to cross-examination about the statement, or (2) the occurrence of the abuse or neglect is corroborated by other evidence." *An. W.*, 2014 IL App (3d) 130526, ¶ 62.  As A.L. did not testify during the adjudication hearing and thus was not subject to cross-examination, we must determine whether there was corroboration.

¶ 89   The Illinois Supreme Court has discussed the meaning of "corroboration" as follows:

"[I]n the context of section 2-18(4)(c), corroborating evidence of the abuse or neglect requires there to be independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred.  *In essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected.*"  (Emphasis added.)  *A.P.*, 179 Ill. 2d at 199.

"Ultimately, whether sufficient corroboration exists is determined on a case-by-case basis." *In re Gabriel E.*, 372 Ill. App. 3d 817, 825 (2007).

¶ 90   At the adjudication hearing, the trial court found that A.L.'s statements during the August 2013 VSI were "corroborated by the fact that she told many people the same simple facts." Mario contends – and the Public Guardian concedes – that "[t]he number of times a child repeats an allegation of abuse does not amount to corroboration." *E.g.*, *In re Custody of Brunken*, 139 Ill. App. 3d 232, 239 (1985) (concluding "that the four witnesses who testified as to [the minor's] alleged statements cannot be deemed to have corroborated each other").

¶ 91 Mario also argues that the "trial court erred in relying on [C.L.'s] hearsay statements when ruling that [A.L.], [M.L.], and [J.L.] were abused and neglected." Citing *In re Alba*, 185 Ill. App. 3d 286 (1989), Mario asserts that "[c]orroborating evidence necessary to allow the hearsay testimony of the minor to be admissible cannot be hearsay itself." In *Alba*, a Head Start Program family service coordinator became concerned regarding the home life of a five-year-old participant in the program. *Id.* at 287. After a discussion wherein the child described being touched by her father, the coordinator asked the child to draw a picture of her father and herself; the drawing was placed into evidence. *Id.* at 287-88. On appeal, the court observed that the child's drawing "was itself hearsay." *Id.* at 290. The court stated that "evidence which is in itself hearsay cannot provide the corroboration required by the statute." *Id.* In *In re Marriage of Flannery*, 328 Ill. App. 3d 602, 614 (2002), the child's "physical actions were offered to prove" her mother's claim that the child was sexually abused. On appeal, the court noted that the child's "actions fit within the definition of hearsay and could not, by themselves, corroborate [the child's] out-of-court statements of sexual abuse." *Id.* Citing *Alba*, the *Flannery* court concluded that "testimony regarding the physical manifestations that accompany a child's hearsay statements of abuse is insufficient to corroborate the out-of-court statements when the child's conduct is the only corroborative evidence presented." *Id.*

¶ 92 Unlike in *Alba* and *Flannery*, the corroboration for A.L.'s prior statements in the instant case did not consist of A.L.'s own out-of-court statements or actions. Furthermore, in more recent cases, this court has permitted hearsay statements of multiple children to corroborate one another. For example, in *In re K.O.*, 336 Ill. App. 3d 98, 102 (2002), a police detective testified that a child made statements that indicated that her father had sexually abused her, and a DCFS investigator testified regarding her conversation with the child's sibling relating to sexual contact

between the father and the child. *Id.* The court concluded, in part, that the child's allegations were corroborated by the sibling, who witnessed the abuse. *Id.* at 109. Similarly, in *In re Alexis H.,* 401 Ill. App. 3d 543, 561 (2010), the appellate court "agree[d] with the trial court that the children's statements of sexual abuse corroborated each other's statements and those statements make it more probable that the children were abused." Although distinguishable from the instant case, both *K.O.* and *Alexis H.* implicitly recognize that multiple hearsay statements may serve as corroboration.

¶ 93     Mario next challenges the admissibility of C.L.'s hearsay statements under various hearsay exceptions. Mario contends that "[C.L.'s] statement of her own abuse are [*sic*] not admissible under the hearsay exception within the Juvenile Court Act regarding statements of abuse by a minor, 705 ILCS 405/2-18, because the exception is limited to the out-of-court statements of the named minor in the petition." The Illinois Appellate Court, however, recently rejected this argument in *In re D.M.*, 2016 IL App (1st) 152608. The *D.M.* court found that "interpreting section 2-18(4)(c) of the Act as allowing a [nonparty minor's] statements of sexual abuse by [her stepfather]" to be admissible as evidence of neglect of her half-siblings "carries out the purpose of the Act." *Id.* ¶ 30. Mario also argues that the "significant lapse in time from the alleged occurrence and outcry as well as a reason to fabricate bars [C.L.'s] hearsay statements from being admissible under the excited utterance exception." The Public Guardian appears to concede this point, stating that "[t]here is no dispute in this case related to the excited utterance exception to the hearsay rule." The parties' disagreement on appeal primarily relates to the applicability of the medical records exception to hearsay set forth in the Act. Mario contends that "[C.L.'s] statements within the Stroger Hospital and St. Elizabeth Hospital medical records are inadmissible under the medical records exception."

¶ 94    Section 2-18(4)(a) of the Act provides, in part:

"Any writing, record, photograph or x-ray of any hospital or public or private

agency, whether in the form of an entry in a book or otherwise, made as a

memorandum or record of any condition, act, transaction, occurrence or event

relating to a minor in an abuse, neglect or dependency proceeding, shall be

admissible in evidence as proof of that condition, act, transaction, occurrence or

event, if the court finds that the document was made in the regular course of the

business of the hospital or agency and that it was in the regular course of such

business to make it, at the time of the act, transaction, occurrence or event, or

within a reasonable time thereafter."  705 ILCS 405/2-18(4)(a) (West 2014).

Mario acknowledges that he did not object to the admission of C.L.'s records from Stroger and

St. Elizabeth, but contends that "this Court should apply the plain error doctrine[11] and not deem

the issue waived due to the error being so serious and father being denied a substantial right."

¶ 95    Mario argues C.L.'s medical records from Stroger and St. Elizabeth were inadmissible

because the "Juvenile Court Act allows for the admission of medical records *only for minors who*

*are parties to the proceedings*."  (Emphasis added.)  In support of this proposition, he cites

section 2-18(4)(a) of the Act, which refers to records of "any condition, act, transaction,

---

[11] "It is well established that, to preserve an alleged error for appellate review, a party must *** object at trial and file a written posttrial motion addressing it." *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011); *In re K.S.*, 317 Ill. App. 3d 830, 833 (2000) (respondent waived her claim regarding the trial court's failure to make factual findings "because respondent failed to object to the order at the hearing").  "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005); see, *e.g.*, *In re S.H.*, 2014 IL App (3d) 140500, ¶ 22 ("An appellate court may address a forfeited issue under the plain error doctrine if the evidence is closely balanced or the error affects substantial rights.").  However, the use of the plain error doctrine in civil cases is exceedingly rare. *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 8 (2007).

occurrence or event *relating to a minor in an abuse, neglect or dependency proceeding*."
(Emphasis added.) 705 ILCS 405/2-18(4)(a) (West 2014). However, this court has construed
the medical records exception in the Act to allow admission of records for individuals other than
"minors who are parties to the proceedings." For example, in *In re Precious W.*, 333 Ill. App. 3d
893, 900 (2002), the trial court found a mother to be unfit because of her habitual drunkenness
and drug addiction and terminated her parental rights regarding her daughter, Precious. On
appeal, the mother argued that the trial court erred by admitting her health care records and the
health care records of her older child, contending they were not "records relating to" Precious.
*Id.* The court disagreed, concluding that the health care records of the mother and the older
sibling were admissible under section 2-18(4)(a) and the trial court did not abuse its discretion by
admitting the records into evidence. *Id.* at 901. Similarly, in *In re M.S.*, 210 Ill. App. 3d 1085,
1095-96 (1991), the appellate court concluded that the mother's medical records regarding her
alcohol and drug dependency, "which were created as a direct result of the ongoing juvenile
court proceeding and relate to a condition which is also directly related to the proceeding, satisfy
the requirement of 'relating to a minor.' " Although their facts differ from the instant case, both
*Precious W.* and *M.S.* belie Mario's contention that the "Juvenile Court Act allows for the
admission of medical records only for minors who are parties to the proceedings."

¶ 96    Mario also contends that "both the State and the GAL argued in the pretrial motion and/or
hearing that [C.L.] should not be allowed to testify because she was not a part of the adjudication
proceeding." The Public Guardian stated in the motion to quash Mario's notice to compel C.L. to
appear that "[a]ny testimony, if at all relevant, is miniscule at best." Mario argues that
"[t]herefore, [C.L.]'s statements within the medical records were inadmissible hearsay." We
disagree with Mario's conclusion. As noted above, the language of section 2-18(4)(a) is not as

33

limiting as Mario suggests. In any event, it appears that C.L. *was* a minor in an abuse or neglect proceeding; the case caption in Mario's notice to compel included four case numbers, referring to pending cases for C.L. (12 JA 831), M.L., A.L., and J.L.[12] Also, the concerns reflected in the Public Guardian's motion to quash – *i.e.,* C.L.'s mental health status and the potentially deleterious effect of compelling her to testify – are not implicated by the admission of medical records. Finally, we note that Mario successfully sought the admission of C.L.'s Hartgrove medical records, over objection – an action seemingly at odds with his position on appeal. In sum, we do not believe the trial court erred in the admission of C.L.'s medical records and thus deem the plain error doctrine inapplicable.[13]

¶ 97    We further conclude that the statements and diagnoses within such records corroborate A.L.'s statements regarding allegations of abuse by Mario. C.L.'s records from Stroger included her statements to Drs. Lorand, Matek and Strunk describing her father fondling her as she slept. She also spoke with Drs. Lorand and Strunk regarding A.L.'s statements relating to Mario. The

---

[12] During oral argument before this court, the State confirmed that C.L.'s case had remained open.
[13] Citing Rule 805 of the Illinois Rules of Evidence, Mario also contends that the "trial court erred when admitting into evidence for the truth of the matter asserted [A.L.'s] statements of abuse as reported by third parties" – *i.e.*, Y.C., C.L., and Araceli – "to Ms. Cole's [*sic*] or Ms. Kincaid-Turner." Mario argues that, because there was no finding that these "third parties" were unavailable, the DCFS employees' testimony regarding their conversations with A.L. were inadmissible. Rule 805 provides, "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Ill. R. Evid. 805 (eff. Jan. 1, 2011). Although section 2-18(1) of the Act provides, in part, that "the rules of evidence in the nature of civil proceedings in this State are applicable to proceedings under this Article," section 2-18(4)(c) specifically states, in part, that "[p]revious statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence." 705 ILCS 405/2-18(4)(c) (West 2014). As the State observes, Mario "does not cite any authority requiring that those witnesses be unavailable," and, in any event, "this claim is forfeited because [Mario] never raised it in the trial court." See, *e.g.*, *K.S.*, 317 Ill. App. 3d at 833. We further note that Mario's brief on appeal references certain statements that he alleges were inadmissible; for example, he argues that "[b]oth [C.L.] and [Y.C.] reported that [A.L.] was known for making up [stories] and changing them as she went along."

"[d]iagnosis" by Dr. Lorand at Stroger was "[c]hild abuse, sexual" and "[s]uicidal ideation." During her hospitalizations at St. Elizabeth, C.L. discussed the sexual touching by her father. Her "[f]inal diagnosis" on September 10, 2013, included "problems with primary support group and sexually abused by her father."

¶ 98     We recognize that the instant case differs from cases such as *K.O.* and *Alexis H.*, wherein the children's statements to interviewers described, among other things, the abuse of their siblings.  In contrast, C.L.'s statements to DCFS, medical professionals, and others described her own abuse and A.L.'s statements regarding A.L.'s abuse, but not C.L.'s personal observation or knowledge of A.L.'s abuse.  However, our supreme court has described corroborating evidence as "evidence that makes it more probable that a minor was abused or neglected." *A.P.*, 179 Ill. 2d at 199.  We conclude that C.L.'s statements and diagnoses make it more probable that A.L. was abused.  As the Public Guardian observes, "[b]oth children described being in bed with their father at night while sleeping, and both children described him fondling them while he lay behind them in bed."  Simply put, we believe that the independent evidence that Mario sexually abused his older daughter, C.L., tended to "strengthen or confirm" (*id.*) A.L.'s prior statements that she was touched inappropriately by Mario.

¶ 99     Although not expressly relied upon by the trial court,[14] A.L.'s prior statements are further corroborated by her description of sexual matters in a manner that may be beyond the knowledge of a typical seven-year-old girl.  The *Alexis H.* court stated that "[t]he children's statements were also corroborated when they described the physical acts of sexual abuse committed on the children in a detailed fashion that would be unexpected of children of their age." *Alexis H.*, 401

---

[14] "[T]his court reviews the determination of the trial court, not its reasoning, and therefore we may affirm on any basis in the record whether or not the trial court relied on that basis or its reasoning was correct." *Antonacci v. Seyfarth Shaw, LLP*, 2015 IL App (1st) 142372, ¶ 21.

Ill. App. 3d at 562. In this case, during her August 2013 VSI, A.L. described her father's "dessy" – *i.e.*, his "private part" – as feeling "flabby." When asked "was his body moving or was he still," A.L. responded, "It moved." Stevenson asked her to describe the movement; A.L. moved her right arm back and forth in a manner that suggested sexual contact. Although A.L.'s descriptions were not as detailed or extreme as in other cases,[15] they provide further corroboration for her prior statements regarding sexual abuse.

¶ 100    In addition to his contentions regarding corroboration issues, Mario argues that C.L. and A.L. had motive to fabricate the allegations. According to Mario, C.L. "did not want to live with her father. She knew that an allegation of abuse would remove her from her father's care." Mario contends that A.L. "had a reputation among her family members for fabricating stories" and "was also intimidated" by C.L. Although the Hartgrove medical records indicated that C.L. did not want to live with Mario, we agree with the Public Guardian's assessment: "[I]t is unlikely that [C.L.] would persist so long with a fabricated claim, and continue to make the claim even after she was removed from her father, and it is unreasonable to assume that [C.L.] would go to such great lengths" – *e.g.*, psychiatric hospitalizations – "with her fabrications." As to A.L. fabricating stories and being pressured by C.L., we also agree with the Public Guardian: "there is no evidence in the record pointing to [A.L.] having any motive to lie about [Mario] abusing her." In any event, the trial court was best positioned to determine whether the children had motive to fabricate the allegations. For example, in *In re Marriage of Gilbert*, 355 Ill. App. 3d 104, 115 (2004), a father accused of sexually assaulting his daughter suggested that his former wife had "motivation to fabricate the entire scenario" and, during their dissolution proceedings,

---

[15] See *e.g.*, *K.O.*, 336 Ill. App. 3d at 108 (child could describe semen); *In re C.C.*, 224 Ill. App. 3d 207, 214 (1991) (same); see also *In re Walter B.*, 227 Ill. App. 3d 746, 755 (1992) (five-year-old child "provided a vivid description of oral copulation" and "demonstrated detailed knowledge of masturbation").

she had "threatened to raise issues of interfamily sexual abuse" that had occurred in his family. Noting that the trial court "had an opportunity to hear the evidence, view the witnesses and make judgments as to their credibility," the appellate court concluded that the trial court's findings of abuse were not against the manifest weight of the evidence. *Id.* In the instant case, after discussing the evidence, the trial court concluded that "there was no reason for the children not to be truthful."

¶ 101   Mario also contends that the trial court disregarded inconsistencies in A.L.'s statements. As an initial matter, we agree that there were inconsistencies in A.L.'s statements. For example, A.L. denied any touching by her father when speaking with Dr. Strunk at Stroger, but later described the touching to Dr. Lorand. A.L.'s answers in her August 2013 VSI differed significantly from her responses in the January 2014 VSI. However, we disagree with Mario's statement that the trial court "disregarded" the inconsistencies. Rather, as the Public Guardian asserts, "the trial court fulfilled its proper role and deliberated on certain inconsistencies in [A.L.'s] story, and properly determined that the allegations were credible anyway." In fact, the trial court expressly recognized that "seven year olds sometimes don't tell the truth; something that all parents know." *Cf. In re S.M.*, 171 Ill. App. 3d 361, 365-66 (1988) (noting that "[c]onflicts or discrepancies in a minor's testimony do not necessarily destroy its credibility, but only affect the weight to be given that evidence"); *In re T.H.*, 148 Ill. App. 3d 877, 882 (1986) (affirming finding of child sexual abuse despite the fact that the "stories told by the children differ in details both major and minor" and the "glaring lack of evidence as to how often the touchings occurred, who was present and what forms the touchings took").

¶ 102   We also reject Mario's contention that "C.L.'s allegation of sexual abuse is not relevant to these proceedings." Evidence is relevant "if it tends to prove a fact in controversy or render a

matter in issue more or less probable." *Kenneth D.*, 364 Ill. App. 3d at 803. A father's alleged sexual abuse of one daughter is relevant regarding allegations of his sexual abuse of a second daughter residing in the same home. See, *e.g.*, 705 ILCS 405/2-18(3) (West 2014) (proof of abuse or neglect of one minor is admissible evidence on the issue of the abuse or neglect of any other minor for whom the respondent is responsible). Furthermore, as discussed above, the statements and records regarding C.L.'s allegations of sexual abuse against Mario served as corroboration for A.L.'s previous statements regarding similar abuse by Mario.

¶ 103   Finally, Mario argues that the trial court improperly relied on the prior abuse findings when Mario was noncustodial. Although the trial court specifically noted during his ruling at the adjudication hearing that "[t]here are prior findings of abuse and neglect in relation to these minors," we are untroubled by this statement. The statement was correct; the minors were the subject of an adjudication order entered on February 27, 2013, in the earlier proceedings. Furthermore, the prior adjudication order – which was admitted into evidence – expressly provided that "Father was non-custodial at all times relevant." During closing arguments in the adjudication hearing, Mario's counsel pointed out that he "came to this country to reunite with his children," *i.e.,* Mario "came here because he heard his children were in foster care." The court responded, "Yes, the Court knows the history." In fact, all of the relevant orders in both the earlier and later cases were entered by the same trial judge. Based on our review of the record, we do not believe the trial court was under any misimpression regarding Mario's noncustodial status during the events relevant to the earlier proceedings, particularly given that the court found Mario to be "fit" during those proceedings.

¶ 104   In sum, we conclude that the trial court's finding that A.L. was sexually abused was not against the manifest weight of the evidence. As noted above, "[a] finding is against the manifest

weight of the evidence only if the opposite conclusion is clearly evident." *Arthur H.*, 212 Ill. 2d at 464. Given the ample evidence in this case – including the testimony of the DCFS child protection specialists, the children's medical records, and A.L.'s recorded VSI – we cannot conclude that the "opposite conclusion is clearly evident." *Id.* Furthermore, the trial court found the testimony of Kincaid-Turner, Cole, and Stevenson to be "credible"; the court made no such express assessment with respect to the testimony of Mario's sister, Abigail. Under the manifest weight standard, we defer to the trial court as the finder of fact "because the trial court is in the best position to observe the conduct and demeanor of the parties and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *An. W.*, 2014 IL App (3d) 130526, ¶ 55.

¶ 105   Mario contends that "[g]iven that the findings of substantial risk of injury and neglect injurious environment concerning [M.L.] and [J.L.] are based on [A.L.'s] finding, this Court should also reverse the abuse and neglect findings for [M.L.] and [J.L.]." Because we have concluded that the trial court's finding that A.L. was sexually abused was not against the manifest weight of the evidence, we reject Mario's contention. We further note that a finding of abuse of one sibling establishes a *prima facie* case of neglect based on an injurious environment to another. *K.O.*, 336 Ill. App. 3d at 108-09; see also *In re M.D.H.*, 297 Ill. App. 3d 181, 189 (1998) (noting that a "parent's behavior toward one minor may be considered when deciding whether a sibling is exposed to an injurious environment"). "Neglect due to injurious environment has been found where the child did not know about nor was he exposed to sexual abuse of a sibling ***." *In re Z.R.*, 274 Ill. App. 3d 422, 428 (1995). The "same facts and evidence which support a finding of neglect due to an injurious environment, also support the court's finding of abuse due to a substantial risk of physical injury." *In re Tamesha T.*, 2014 IL

App (1st) 132986, ¶ 44. Based on the foregoing, we conclude that the trial court's findings of abuse and neglect with respect to M.L., A.L., and J.L. were not against the manifest weight of the evidence.

¶ 106                    B. Whether Mario's Due Process Rights Were Violated

¶ 107   Mario contends that his "due process rights were violated because he was denied the right to defend himself against the allegations and subsequent findings of sexual abuse against [C.L.]." Although we recognize that a "parent's right to raise his or her biological child is a fundamental liberty interest" (*In re Haley D.*, 2011 IL 110886, ¶ 90), the paramount consideration in any proceeding initiated under the Act, including an adjudication of wardship, is the best interest of the child. *In re N.B.*, 191 Ill. 2d 338, 343 (2000).

¶ 108   Mario appears to challenge the denial of his request to compel C.L.'s appearance at the adjudication hearing. "[E]videntiary rulings are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion." *In re A.W.*, 397 Ill. App. 3d 868, 873 (2010). "A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* In light of C.L.'s mental health issues and her relative stability at the time of the adjudication hearing, the trial court did not abuse its discretion in denying Mario's request to compel C.L.'s appearance at the hearing. See *id.* at 874 (trial court did not abuse its discretion in barring mother from calling her 15-year-old son as a witness at a best interest hearing based on evidence that requiring the son to testify would be detrimental to his best interest); *In re Mark W.*, 383 Ill. App. 3d 572, 590 (2008) (trial court did not abuse its discretion in denying plenary guardian's request to have minor testify where the minor's therapist indicated that his appearance in court could "set back" his "therapeutic progress" and "hinder the child's emotional stability").

Furthermore, as the Public Guardian notes, "the trial court specifically allowed [Mario] to 'revisit' the issue if he felt it was crucial, but [Mario] never raised the issue again."

¶ 109   Mario also contends that it was "fundamentally unfair" for him "to have to defend against allegations that [C.L.] was abused despite no petition for adjudication of wardship or any other type of pleadings naming her" having been filed.  The State observes, and we agree, that Mario "never explains what additional safeguards he would have received had there been a petition for adjudication of wardship for [C.L.]."[16]  In addition, Mario argues that he "also was barred from a meaningful hearing by not receiving a copy of the recording of [C.L.'s] victim sensitive interview."  However, the ASA confirmed to the trial court that "we don't have any record."  We agree with the Public Guardian that Mario "cannot complain of not receiving a copy of the recording of [C.L.]'s interview, where no such copy was ever admitted into evidence, and no party even possessed it."

¶ 110    "Due process is not a technical concept unrelated to time, place, and circumstances, but is flexible and calls for such procedural protections as a particular situation demands."  *A.W.*, 397 Ill. App. 3d at 872.  Mario had the opportunity to be present, to argue his position, and to present and rebut evidence.  See *id*. at 873.  Based on the facts and circumstances of these cases, we conclude that the trial court did not deprive Mario of his due process rights.

---

[16] During oral argument before this court, Mario's counsel stated that, if there had been a petition for C.L., "the sufficiency of [C.L.'s] allegation would have been tested in an adjudicatory hearing where the rules of evidence that are required for civil proceedings would have applied." However, Mario's due process concerns seem misplaced given that, among other things: (a) he was aware that the State's case would include evidence relating to C.L. prior to the trial court proceedings in the instant case, as evidenced by his notice to compel C.L.'s appearance and his motion *in limine* with respect to her interview; and (b) the concerns regarding C.L.'s mental health and emotional stability that led the court to grant the motion to quash his notice to compel her appearance would exist irrespective of the filing of a new petition.  In any event, because we have affirmed the trial court's finding of sexual abuse *vis-à-vis* A.L., we need not speculate about the potential outcome of a hypothetical new petition filed for C.L.

¶ 111                       C. The Disposition Order

¶ 112    Finally, we observe that the notice of appeal sought relief from the adjudication and disposition orders. On appeal, Mario asserts – without additional argument – that "[g]iven that there was insufficient evidence to support the adjudication findings, this Court should also reverse the disposition order adjudging the children wards of the court." As discussed above, we affirm the trial court's findings at the adjudication hearing; accordingly, Mario's contention that the disposition order should be reversed is without merit. In the absence of any other arguments, we affirm the disposition order. See, *e.g.*, *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 69. See also Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (providing that "[p]oints not argued" in an appellant's brief "are waived"); *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 57 ("Because we have concluded that the trial court did not err in finding the minors dependent, we similarly reject respondent's challenge to the trial court's dispositional finding.").

¶ 113                       III. CONCLUSION

¶ 114    For the reasons stated above, we affirm the adjudication and disposition orders of the circuit court of Cook County.

¶ 115    Affirmed.