2019 IL App (1st) 182226

FIRST DISTRICT,
SECOND DIVISION
July 23, 2019

No. 1-18-2226

| | | |
|---|---|---|
| *In re* J.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| | ) | No. 12 JA 00846 |
| Petitioner-Appellee, | ) | |
| v. | ) | |
| | ) | Honorable |
| C.F., | ) | Nicholas Geanopoulos, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |
| | ) | |

JUSTICE MASON delivered the judgment of the court, with opinion.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1     Respondent C.F. appeals the involuntary termination of her parental rights with respect to

her daughter, J.C., following a September 19, 2018, hearing in which she was found unfit under

the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2016)) and

the Adoption Act (750 ILCS 50/1(D) (West 2016)). C.F. does not challenge the trial court's

termination of parental rights findings but argues solely that the court erred in denying her

motion to compel nine-year-old J.C. to testify at the termination hearing. Finding no error, we

affirm.

¶ 2                                    BACKGROUND

¶ 3     J.C. was born to C.F. on February 17, 2009. In August 2012, an anonymous call was

made to the Department of Children and Family Services (DCFS) reporting a child left alone in a

park. Police reported to the scene and found J.C. sitting alone in a stroller. Fifteen minutes after the police arrived, C.F. came and tried to push the stroller away. She told police that she was J.C.'s mother and they were homeless. She admitted that she slept in the park and left J.C. alone on a daily basis while she went to public restrooms to change her clothes and use drugs. Police found "many syringes" wrapped up in a diaper in the stroller with "evidence of recent use." C.F. was arrested for child endangerment, and J.C. was taken to a hospital for observation.

¶ 4    On August 29, 2012, the State filed a petition for adjudication of wardship over J.C., alleging that J.C. was neglected due to lack of care and an injurious environment and abused due to a substantial risk of physical injury. The State alleged that C.F. had "a long history of substance abuse that has not been addressed." Based on prior indicated reports, an intact family case was opened in 2011 to offer substance abuse treatment to C.F., but C.F. refused to participate in services, and the case closed in May 2012. The State further alleged that J.C.'s father was deceased. (The father's death certificate was later introduced into evidence.)

¶ 5    On March 7, 2013, after an adjudication hearing, the trial court entered a finding that J.C. was neglected due to C.F.'s lack of care and an injurious environment. Following a dispositional hearing on May 9, 2013, the trial court found C.F. unable to care for J.C. and entered an order making J.C. a ward of the court.

¶ 6    On May 27, 2016, after three years of periods of progress followed by lack of progress on C.F.'s part, the trial court found that C.F. had not made substantial progress toward J.C.'s return, stating that C.F. "still needs to participate in services in order to change the conditions that led to [J.C.] being placed in DCFS care." Shortly thereafter, on July 15, 2016, J.C. was placed with a preadoptive foster home. On May 3, 2017, the trial court entered a permanency goal of substitute care pending a court determination on termination of C.F.'s parental rights.

¶ 7     On October 5, 2017, the State filed a "Supplemental Petition for the Appointment of a Guardian with the Right to Consent to Adoption," requesting the court find C.F. an unfit parent, permanently terminate C.F.'s parental rights, and appoint a guardian with the right to consent to J.C.'s adoption. The State alleged that J.C.'s foster parents wished to adopt her and adoption was in her best interest.

¶ 8     The termination hearing was set for September 19, 2018. On August 31, 2018, C.F. moved to compel then nine-year-old J.C. to appear and testify at the hearing. In response, J.C.'s attorney and guardian *ad litem* (GAL) filed a motion to quash the notice to compel, arguing that it was not in J.C.'s best interest to appear or testify. The GAL alleged that, during the past two years, J.C. had not wanted much, if any, contact with her mother, and she continually voiced this opinion to her caseworker, her therapist, and the GAL. Following her last two supervised visits with her mother on February 26 and April 27, 2018, J.C. did not want to resume visitation, because she was focused on her life at home and at school. The GAL stated that J.C. "has been subject to several very stressful and turbulent years" and opined that requiring her testimony would risk causing further emotional damage.

¶ 9                     Termination of Parental Rights Hearing

¶ 10     The September 19, 2018, hearing began with the court addressing C.F.'s motion to compel J.C.'s testimony. As an offer of proof, C.F.'s counsel stated that, if called to testify, J.C. would state that she wanted to say goodbye to her mother and was not able to interact with her during visitation. J.C. would additionally testify that she wished to continue seeing her mother and did not want to cease all contact.

¶ 11     In further support of his motion, C.F.'s counsel argued that "the mother has the right to hear what the child is going to say." He stated that the GAL's allegation that J.C. did not want to

see her mother was contrary to the mother's experiences during visitation, in which J.C. was "very affectionate," running up to her, hugging her, asking "Where have you been?" and "When am I going to see you *** again?" He therefore argued that C.F. should be allowed to hear J.C.'s testimony so she could know her daughter's true wishes. He suggested that, if testifying in front of her mother would be difficult for J.C., she could instead give testimony *in camera*.

¶ 12    In response, the GAL stated that there was no compelling reason to demand J.C.'s testimony, since, at best, it would pertain only to the question of her best interests and not to C.F.'s fitness as a mother. The GAL asserted that demanding her presence under those circumstances would amount to "harassment, oppression, and undue hardship." The State joined in the GAL's objection, pointing out that C.F. could testify to her relationship with J.C., thus rendering J.C.'s testimony redundant. The State also presented a letter from J.C.'s former therapist in which the therapist stated: "[T]riggers of her biological mother have adversely impacted [J.C.]. *** Given that both her biological mother and court are stressors for [J.C.] at this time, testifying will likely be troublesome for [J.C.]."

¶ 13    The trial court denied the motion to compel J.C.'s testimony, finding that it was not in her best interest "given the history of the case and minor's own emotional needs and her special needs that have come out over the course of this case over the years." C.F.'s counsel then requested sanctions, asking that J.C.'s out-of-court statements regarding C.F. not be allowed even if they fell under an exception to the hearsay rule. (Counsel was unclear against whom these sanctions would be imposed.) The trial court denied the request, finding sanctions to be inappropriate where no party had failed to comply with a court order.

¶ 14    The case proceeded to a hearing on C.F.'s fitness as a parent. The State called Alexa Vander Hye and Scott Wolff-Klammer, both of whom were foster care supervisors at Children's

Home & Aid and oversaw J.C.'s case. Hye was J.C.'s caseworker from October 2016 to April 2018, and Wolff-Klammer took over starting on April 30, 2018. During this time, C.F. was assessed for domestic violence services, parenting classes, parent coaching, individual therapy, family therapy, and substance abuse treatment. Of those, she only successfully completed domestic violence services and parenting classes.

¶ 15        C.F. was assessed for parent coaching because she was overly authoritarian: she was "very rigid *** in terms of how a child should behave" and blamed J.C. for the DCFS proceedings. C.F. also called J.C. manipulative and a liar and, on one occasion, threatened to "whup" her. C.F.'s negativity harmed J.C.'s self-esteem. Nevertheless, C.F. did not successfully complete parent coaching; she wanted to end the coaching sessions because "she thought she was not the one with the problem *** [and] that [J.C.] was the only one who needed help."

¶ 16        C.F. also failed twice to complete an individual therapy program. The first attempt failed because C.F.'s attendance was inconsistent, she refused to accept responsibility for her own actions as a mother, and she failed to develop proper parenting strategies. The second attempt failed because of C.F.'s poor attendance: she missed half of the sessions and frequently came late and/or left early for the remaining ones. Because C.F. did not complete either individual therapy or parent coaching, family therapy was never started.

¶ 17        With regard to substance abuse treatment, C.F. completed intensive outpatient treatment but did not complete the aftercare program. She frequently missed meetings with her assigned recovery coach. She also missed the majority of requested "drops" (drug tests), including all scheduled drops from October 2016 to January 2017. Eventually, she was removed from the program due to nonattendance. On cross-examination, Hye admitted that C.F. did not test

positive for illegal substances in any drops she participated in and, during Hye's brief meetings with C.F., Hye never had cause to believe that C.F. was under the influence of drugs.

¶ 18     Hye and Wolff-Klammer also testified regarding C.F.'s visitation with J.C. (Hye's testimony was based upon case notes, the agency file, and meetings with a caseworker she supervised; she never personally observed C.F. with J.C. As for Wolff-Klammer, he had no personal contact with C.F. at all.) In October 2016, supervised visitation was scheduled for two-hour sessions twice a week at C.F.'s home. C.F. often canceled visitation or was not home at the scheduled time. When she was present, her behavior was frequently inappropriate: she sometimes spent the majority of the visitation time in a separate room from J.C., she was aggressive toward agency staff, and she did not discipline J.C. in a positive way. In November 2016, visitation was reduced to a one-hour session twice a month. C.F.'s attendance improved, but she continued being aggressive toward agency staff and failing to positively discipline J.C.

¶ 19     In March 2017, the visitation sessions were moved to the agency. C.F. canceled many of the sessions, and when she did appear, she would often leave after 20 to 30 minutes. Finally, in May 2017, when J.C.'s permanency goal was changed to substitute care pending a determination on termination of parental rights, C.F.'s visitation was reduced even further, to a one-hour session once a month. C.F. did not participate in any of these sessions and never sent any gifts, cards, or letters to J.C. By the time Wolff-Klammer was assigned to J.C.'s case on April 30, 2018, the agency did not know C.F.'s location despite a diligent search. The visitation plan was still for visitation once a month at the agency if J.C. agreed to it. Wolff-Klammer spoke to J.C. once in July 2018 and once in August 2018, and both times J.C. said she did not want visitation.

¶ 20     Finally, regarding J.C.'s medical needs, Hye testified that J.C. had been diagnosed with attention deficit/hyperactivity disorder (ADHD), for which she was prescribed medication, and

degenerative hearing loss, for which she used hearing aids. Hye had concerns about C.F.'s ability to meet J.C.'s needs because, during visitation, C.F. sometimes failed to give J.C. her ADHD medication at scheduled times. Additionally, J.C. had a history of behavioral issues that C.F. was not able to appropriately redirect or discipline.

¶ 21 C.F. testified on her own behalf. Prior to 2018, C.F. testified that she was generally consistent with visitation, although she missed "one or some" visits because of documented medical reasons. Whenever this occurred, she showed her appointment papers to the caseworker.

¶ 22 According to C.F., she had visitation with J.C. twice in 2018, once in February and once in April. At the February visit, they celebrated J.C.'s birthday. C.F. brought her a cake and food from McDonald's. It had been almost a year since they last met. J.C. came running toward her, crying; she asked C.F. where she had been and why she hadn't come to look for her. Similarly, at the April visit, J.C. ran toward her, hugged and kissed her, and asked where she had been. C.F. replied, "It's not that I didn't want to see you, but they were not letting me see you." Because of that statement, her caseworker threatened to cancel her visitation and told her not to give that kind of information to J.C.

¶ 23 After the April 2018 visit, C.F. testified that she repeatedly called her caseworker to arrange another visit but nobody ever picked up the phone. She left many messages but never received any return calls. She could not send gifts, cards, or letters to J.C. because she did not know the address of her foster home. At the most recent court date, C.F. saw the caseworker in person. She told the caseworker that she had been trying to get in touch for the past three months and asked why she received no response. The caseworker said it was because J.C. did not want to see her. C.F. testified this was contrary to her own experiences with J.C. C.F. concluded that she

had "no reason" to believe that J.C. did not want to see her and reunification had always been C.F.'s goal.

¶ 24    Regarding the services she received, C.F. stated that she underwent individual therapy, as well as family therapy with J.C. in her house. Additionally, she took intensive driving under the influence classes. She "almost always" did her drug tests, but there were occasions where she missed tests because she had work or a doctor's appointment and was unable to coordinate schedules with her caseworker.

¶ 25    Finally, regarding J.C.'s medical needs, C.F. testified that nobody from the agency explained J.C.'s diagnosis of ADHD or instructed her regarding J.C.'s ADHD medication. "They told me something," she said, "but *** I don't really have knowledge of what that refers to." C.F.'s cousin, who had custody of J.C. from 2013 to 2015, gave C.F. instructions regarding J.C.'s medication, which C.F. always followed. Additionally, nobody from the agency told C.F. that J.C. had degenerative hearing loss; C.F. also found out about that from her cousin. C.F. asserted that J.C. had no hearing problems when she first came into DCFS care.

¶ 26    Following argument by the parties, the trial judge observed that he had presided over J.C.'s case since September 2012. In light of his experience, he found C.F.'s testimony to be "highly incredible" and opined that she "made up" many things in an attempt to help her case. The court then found C.F. unfit on three grounds.[1] First, C.F. failed to maintain a reasonable degree of interest, concern, or responsibility as to J.C.'s welfare. 750 ILCS 50/1(D)(b) (West 2016). Second, she failed to make reasonable efforts to correct the conditions which were the basis for J.C.'s removal, and she also failed to make reasonable progress toward J.C.'s return in a nine-month period. *Id.* § 1(D)(m). In this regard, the court found that C.F. made some progress

---

[1]The court declined to enter a finding as to the State's allegation that C.F. deserted J.C. for more than three months preceding the commencement of termination proceedings (750 ILCS 50/1(D)(c) (West 2016)).

early on but, as time went on, her participation in services decreased and she became increasingly uncooperative, as evidenced by missed visitation sessions, missed drug drops, and her statement to her therapist that she wanted to discontinue therapy because J.C. was the one with problems. Finally, C.F. failed to make contact with J.C. or plan for her future. *Id.* § 1(D)(n). The court specifically did not find credible C.F.'s testimony that she tried to contact the agency and her calls were not answered.

¶ 27        The case then proceeded to a hearing on J.C.'s best interest. Temok C.H. testified that he and his husband, Salvador H.C., have been J.C.'s foster parents for two years and J.C. is "doing great." When she first came to live with them, she had poor grades and lacked social skills, but thanks to therapy, she now gets straight As and has improved confidence. She attends a charter school where she participates in several after-school programs, including gymnastics and running.

¶ 28        J.C. calls Temok "Dad Temok" and calls Salvador "Dad Sal." As a family, they go to the theater, watch TV, and take vacations together. While on summer vacation in Davenport, J.C. saw a little library and wanted one at her house, so when they returned home, Salvador built one for her. Both Temok and Salvador are fluent in Spanish, and they work to foster J.C.'s cultural identity as a person of Puerto Rican heritage.

¶ 29        Temok wanted to adopt J.C. because she was really happy with their family. He and Salvador spoke with J.C. about staying in their home forever. J.C. told them that she was excited to be part of their family; she wanted to stop being in limbo and have a stable home.

¶ 30        Temok also testified that he was not opposed to future contact between J.C. and her mother. At one point, he asked the agency to help him get in touch with C.F.; the agency said it would try, but it later told him that it could not locate her. Temok also encouraged J.C. to stay in

touch with her mother. Initially, J.C. was receptive, but after many attempts at contact failed, J.C. told him, "I don't want to see my mom any more."

¶ 31    Wolff-Klammer testified that he personally observed J.C. with her foster parents on two occasions, and he believed they were "good advocates" for her. They provided her proper food, shelter, and clothing. They assisted with the services J.C. was receiving for her ADHD and progressive hearing loss. They treated her with affection and were able to discuss ongoing issues and plans for the future; J.C. could speak with them about her needs. They cooked and practiced Spanish together and also created a community library outside their house. In her two years with her foster family, J.C.'s behavior improved, and she was thriving. Finally, J.C. wished to be adopted. Wolff-Klammer opined that it was in J.C.'s best interest that C.F.'s parental rights be terminated and that J.C. be adopted by her foster parents.

¶ 32    C.F. testified on her own behalf that she asked J.C.'s last two caseworkers and last two case supervisors for contact information for J.C.'s foster parents. Each time, she was told that the information was private and could not be given out without the foster parents' permission. C.F. asked to meet with the foster parents on three occasions, but the agency never set up a meeting.

¶ 33    At the close of evidence, C.F. renewed her motion to compel J.C.'s testimony. Her counsel argued that J.C.'s testimony was needed to resolve the conflicting evidence as to what she wanted. Counsel also argued that J.C. had a right to express her own opinion and her mother had a right to hear it. In opposition, the State pointed out that if J.C. testified and her mother's parental rights were then terminated, J.C. might think she caused that outcome, which could be damaging to her. The trial court agreed with the State and denied the motion.

¶ 34    The court then found that it was in J.C.'s best interest to terminate C.F.'s parental rights and appoint a guardian for J.C. with the right to consent to her adoption. In doing so, the court

explicitly considered the best interest factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2016)). It found that J.C.'s foster parents were providing for her physical safety and welfare and they also provided her affection and a sense of security and familiarity. It additionally found that J.C. was flourishing in her foster home. The court acknowledged that C.F. wished to live with J.C., but it found that, given the history of the case and the totality of the circumstances, it was not in J.C.'s best interest.

¶ 35    After the trial court issued its ruling, C.F.'s counsel stated that C.F. wanted to have contact with J.C.'s new family and intended to ask for their contact information. The trial court observed that the foster parents had already left, but it stated that "[t]he supervisor is here, and I'm going to ask that he follow up and make that happen, and if it's appropriate, then they can work on that."

¶ 36    ANALYSIS

¶ 37    C.F. appeals from the trial court's September 19, 2018, order terminating her parental rights. She does not argue that the trial court's order was against the manifest weight of the evidence, nor does she challenge the trial court's findings as to her unfitness and J.C.'s best interest. Rather, she argues solely that denying her motion to compel J.C.'s testimony was an abuse of discretion and a violation of her due process rights.

¶ 38    The trial court's power to compel a party's appearance at trial lies within its sound discretion and "should only be exercised for a good cause and in such a manner that a party may not be subject to harassment, oppression, or hardship." (Internal quotation marks omitted.) *In re Mark W.*, 383 Ill. App. 3d 572, 590 (2008). We will not find an abuse of discretion unless the trial court's ruling is arbitrary, fanciful, or unreasonable or no reasonable person would take the trial court's view. *In re A.W.*, 397 Ill. App. 3d 868, 873 (2010). We additionally are mindful that

the Juvenile Court Act is to be "administered in a spirit of humane concern." 705 ILCS 405/1-2(2) (West 2016). Proceedings under the Juvenile Court Act are not intended to be adversarial; rather, the paramount consideration is the best interest of the child. *A.W.*, 397 Ill. App. 3d at 872; *In re J.L.*, 2016 IL App (1st) 152479, ¶ 107.

¶ 39    This court has held on multiple occasions that, in proceedings under the Juvenile Court Act, the trial court has discretion to prevent parents from compelling their minor children to testify if the court finds that testifying is not in the children's best interests. *A.W.*, 397 Ill. App. 3d at 874; *J.L.*, 2016 IL App (1st) 152479, ¶ 108; *Mark W.*, 383 Ill. App. 3d at 589-90. In *A.W.*, 397 Ill. App. 3d at 869, the trial court barred a mother from calling her 15-year-old son to testify at a best interest hearing. We affirmed, explaining:

> "Overall, determining whether to place a child in the position to testify in a termination proceeding must be left to the discretion of the trial judge. The record indicates that the trial court's decision to exclude A.W., Jr., from testifying was based upon evidence that requiring A.W., Jr., to testify would be detrimental to his best interest. We can only imagine the stress and pressure placed on children that are requested to testify in this setting, the impact of which will undoubtedly affect them long-term. We simply cannot know the detrimental effects caused by placing a child in such a situation." *Id.* at 874.

¶ 40    Similarly, in *J.L.*, 2016 IL App (1st) 152479, the respondent father filed a notice to compel the appearance of his daughter, C.L., at an adjudication hearing. The trial court quashed the notice. We found this to be within the trial court's discretion in light of evidence that C.L. had a history of mental health issues and the need for her testimony was outweighed by the risk of her becoming destabilized. *Id.* ¶¶ 15-16, 108.

¶ 41        Finally, in *Mark W.*, 383 Ill. App. 3d at 589-90, we held that the trial court did not abuse

its discretion in denying the respondent mother's attempts to call her minor son, Mark. Mark's

therapist believed that testifying would be detrimental to him, and the trial court, after

considering Mark's age and the efforts that could be made to make him feel comfortable in court,

concluded that testifying was not in his best interests. *Id.* at 590.

¶ 42        Notwithstanding this precedent, C.F. argues that denying her motion to compel was an

abuse of discretion because there was no evidence that testifying would be detrimental to J.C.

The record flatly contradicts this assertion. At the hearing, the State presented a letter from J.C.'s

former therapist stating:

> "[T]hroughout my work with her and at the time of case closure [in June 2018], triggers
>
> of her biological mother have adversely impacted [J.C.] She would shut down and
>
> withdraw from conversations related to her biological mother. *** Given that both her
>
> biological mother and court are stressors for [J.C.] at this time, testifying will likely be
>
> troublesome for [J.C.] *** If she were to testify, she would need significant support, such
>
> as from her foster parents, to feel safe and secure as she demonstrated a secure
>
> attachment to them at the time of case closure."

In this letter, the therapist plainly states that testifying would be "troublesome" for J.C. because

both her biological mother and courts are stressors for her. Even testifying *in camera*, as

suggested by C.F.'s trial counsel, would not entirely solve these issues, since the therapist stated

that J.C. shuts down and withdraws from conversations related to C.F.

¶ 43        C.F. focuses on the last sentence of the therapist's letter, arguing that J.C. could

potentially have testified with "significant support" from her foster parents. But this sentence

cannot be read outside the context of the rest of the letter, in which the therapist is clear that

testifying would be both stressful and troublesome for J.C. Moreover, the testimony at the hearing was that J.C. had made significant progress in therapy over the past two years, leading to improved grades and social confidence. In light of these facts, it was well within the trial court's discretion not to jeopardize that progress by forcing her to testify about her mother.

¶ 44    Nor do we find that C.F. was prejudiced by the lack of J.C.'s testimony. At the outset, we observe that J.C.'s testimony would not have been pertinent to the issue of C.F.'s fitness as a parent, only to her best interest. On that issue, it was never alleged that J.C. was opposed to adoption or that she was unhappy with her foster family in any way. C.F.'s counsel alleged only that J.C. wanted to say goodbye to her mother (which suggests that she was, in fact, anticipating adoption) and that she did not want to cease contact with her mother (which would have been duplicative of Temok's testimony that he was not opposed to contact between J.C. and her mother and, in fact, encouraged J.C. to maintain a relationship with her). Furthermore, the child's wishes are just one of the best interest factors to be considered under section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2016)). The trial court engaged in a detailed analysis of each factor in light of all the evidence and its six years' experience with J.C.'s case, and it found adoption to be in J.C.'s best interest. Thus, J.C.'s expected testimony, as set forth in C.F.'s offer of proof, would not have changed the outcome of the proceeding.

¶ 45    At the termination hearing, C.F.'s counsel argued that J.C. should testify because, essentially, it would be in her mother's best interest. He stated that C.F. was baffled to hear from the GAL and from J.C.'s caseworker that J.C. did not wish to see her and that C.F. wanted to hear the truth from her daughter's own mouth. While we are not unsympathetic to C.F.'s concerns, her personal desire for closure has no direct bearing upon the issues the court was called upon to decide in this case, namely, C.F.'s fitness as a parent and J.C.'s best interest.

Moreover, as discussed, the paramount consideration in proceedings under the Juvenile Court Act is the best interest of the child, not that of the mother. *A.W.*, 397 Ill. App. 3d at 872; *J.L.*, 2016 IL App (1st) 152479, ¶ 107. Accordingly, the trial court's decision not to compel J.C.'s testimony was not an abuse of discretion.

¶ 46    C.F. next argues that the trial court violated her due process rights by not compelling J.C. to testify. Because parents have a fundamental liberty interest in the care, custody, and control of their children, parents are entitled to due process in termination of parental rights proceedings. *In re M.H.*, 196 Ill. 2d 356, 362-63 (2001). In determining whether a parent was deprived of due process in a termination proceeding, we consider three factors: (i) the private interest affected by the State's action; (ii) the risk that the parent was erroneously deprived of that interest because of the procedures used, and the probable value, if any, of other procedural safeguards; and (iii) the State's interest, including the fiscal and administrative burden of additional procedural safeguards. *A.W.*, 397 Ill. App. 3d at 872-73 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *M.H.*, 196 Ill. 2d 356).

¶ 47    Applying the *Mathews* factors here, C.F. was afforded adequate procedural due process at the termination hearings. As C.F. argues and as the State acknowledges, she had a strong private interest in maintaining her parental relationship with J.C. But given the facts of this case, we do not find that excluding J.C.'s testimony risked C.F. being erroneously deprived of that interest. C.F. had the opportunity to be heard; she was able to explain her position, present evidence, and rebut the State's evidence. See *A.W.*, 397 Ill. App. 3d at 873 (barring testimony of 15-year-old son at termination hearing did not violate due process rights of mother, since mother had opportunity to present evidence and rebut the State's evidence); *J.L.*, 2016 IL App (1st) 152479, ¶ 110 (father's due process rights were not violated at adjudication hearing where father's notice

to compel his daughter's testimony was quashed but father "had the opportunity to be present, to argue his position, and to present and rebut evidence"). For the reasons discussed above, J.C.'s testimony would not have changed the outcome of the proceeding. Finally, in any proceeding under the Juvenile Court Act, the State's interest is the child's best interest, to which compelling J.C.'s testimony would have been detrimental. Accordingly, we find that denying C.F.'s motion to compel did not violate her right to due process.

¶ 48                                    CONCLUSION

¶ 49        The trial court did not violate C.F.'s due process rights by denying her motion to compel nine-year-old J.C.'s testimony, nor was its decision an abuse of discretion in light of the evidence that testifying could adversely impact J.C. Accordingly, we affirm the trial court's decision in its entirety.

¶ 50        Affirmed.

---

**No. 1-18-2226**

---

| | |
|---|---|
| **Cite as:** | *In re J.C.* , 2019 IL App (1st) 182226 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12–JA-00846; the Hon. Nicholas Geanopoulos, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | |

---

| | |
|---|---|
| **Attorneys for Appellee:** | |

---