2026 IL App (1st) 250918

FIRST DISTRICT
SECOND DIVISION
June 16, 2026

No. 1-25-0918

| | | |
|---|---|---|
| *In re* A.E. and C.D., Minors-Appellees, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) ) | Nos.   24JA477 |
| Petitioner-Appellee, | ) ) | 24JA478 |
| v. | ) ) | |
| S.E., | ) ) | Honorable Andrea M. Buford |
| Respondent-Appellant). | ) ) | Audrey Cosgrove, Judges Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Ellis and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent S.E. appeals the juvenile court's order adjudicating minors A.E. and C.D. to be abused or neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2024)) based upon an injurious environment and a substantial risk of physical injury. Following a dispositional hearing, the trial court found it was in the minors' best interests to be adjudged wards of the court. Respondent argues (1) the trial court's findings that the minors were abused or neglected were against the manifest weight of the evidence and (2) the trial court abused its discretion when it denied respondent's request to compel the appearance of

the minors at the adjudicatory hearing. A.E. and C.D. have different fathers, and neither father is a party to this appeal.

¶ 2     A.E., a female child, was born on May 12, 2010. C.D., a female child, was born November 27, 2011. Respondent is the natural mother of both minors. Petitions for adjudication of wardship for each of the minors were filed on July 8, 2024, alleging the minors were neglected because their environment was injurious to their welfare and abused because of a substantial risk of physical injury. The petition for A.E. alleged the following supporting facts:

> "Mother has eight[1] other minors who are or were in DCFS [Department of Children and Family Services] custody with findings of abuse and/or neglect entered. This minor and this minor's sibling were previously in the custody of DCFS with findings of abuse and/or neglect entered; their cases were closed with custody to stand with mother on October 5, 2016. Mother has a history of being involved in physical altercations with this minor's siblings. Mother established care plans for this minor and this minor's sibling with fictive kin[2] on multiple occasions beginning in 2018. In June 2024, this minor and this minor's sibling stayed with mother for a week. This minor and this minor's sibling reported that when mother returned home at approximately 3 am on June 16, 2024, mother choked this minor. Mother told this minor and this minor's sibling to leave mother's home. On June 25, 2024, mother stated that she is not in agreement with the current caregivers having guardianship of this minor and this minor's sibling.

---

[1]While the petition stated respondent had 8 other minors in addition to A.E. and C.D., the record established that respondent had a total of 11 children in DCFS care at some point.

[2]The Children and Family Services Act defines "fictive kin" as "a person who is unrelated to a child by birth, marriage, tribal custom, or adoption who is shown to have significant and close personal or emotional ties with the child or the child's family." 20 ILCS 505/4d (West 2024).

Paternity has not been established. Putative father's whereabouts are unknown." C.D.'s petition alleged the same supporting facts except her paternity had been established and her father was incarcerated.

¶ 3 The State moved for temporary custody of the minors and following a hearing, and the juvenile court found probable cause existed that the minors were abused and neglected and ordered the minors removed from respondent's home. The court ordered that visitation between the minors and respondent to be "as liberal as possible at the discretion of the minors."

¶ 4 In November 2024, respondent filed a notice to compel the appearances of both A.E. and C.D. to testify at the adjudicatory hearing. Respondent's initial motion was stricken for failure to comply with Illinois Supreme Court Rule 237(b) (eff. Oct. 1, 2021), but she subsequently refiled in compliance with the rule. The public guardian (guardian), on behalf of the minors, moved to quash respondent's notice to compel their appearance, arguing that it was not in the best interest of the minors to appear in court and there was no compelling reason to demand the minors' presence or testimony. Specifically, the guardian asserted that it was not in their best interest to relive a traumatic event and forcing them to testify would harass the minors, place them under undue duress, and would be oppressive. Additionally, the guardian maintained that their testimony was not necessary because both minors previously provided statements to the child protection investigator and those statements were admissible in evidence.

¶ 5 The guardian attached a report to the motion summarizing the integrated assessment of the family by the Department of Children and Family Services (DCFS). The integrated assessment detailed the extensive DCFS history of respondent and her children. The minors were previously removed from respondent's care in 2013 when they were 3 and 1 years old after respondent had a physical altercation with the minors' oldest sister (then 15 years old). The

juvenile court found the minors abused and neglected with respondent as the perpetrator. The minors were returned to respondent's care in 2016, and the case was closed. The assessment observed that both minors have a history of suicidal ideation and were in need of therapy. The minors' nine older siblings also had extensive involvement with DCFS. At the time of the assessment, their siblings ranged in age from 27 to 17 years old. Respondent had previously agreed to terminate her parental rights to her twin daughters, the eighth and ninth born children. The minors are respondent's youngest children. According to C.D.'s foster father, the minors had spent the previous two years moving back and forth between the foster parents and respondent before DCFS formally placed them into protective custody.

¶ 6 The integrated assessment also detailed that the minors were exposed to respondent's physical abuse of their siblings, as well as respondent's substance abuse and untreated mental health issues. A.E. was exposed to marijuana in utero. A.E. appeared to be coping with the stress from the recent changes by "retreating, isolating, avoiding, and numbing." A.E. has an individualized education program (IEP) due to behavioral needs and was also diagnosed with developmental disorders. A.E. has asthma. A child protection investigator reported that she heard A.E. express suicidal ideation while at the hospital following the June 16, 2024, choking incident with respondent, but A.E. denied having suicidal ideation during her integrated assessment interview. The assessment recommended A.E. participate in individual trauma-based therapy to help her understand the trauma she has experienced.

¶ 7 C.D. was diagnosed with eye cancer when she was two years old, which led to the removal of one eye and the use of a prosthetic eye. C.D. was also diagnosed with leukemia for which she received treatment as a young child. C.D. had reported that she did not always feel safe in respondent's care. When C.D. was younger, she had an IEP to receive speech therapy due

to her "selective mutism." At the time of the assessment, C.D. had an IEP due to vision issues from the loss of one eye. C.D. reported that she had experienced suicidal ideation while living with respondent and while previously living with her foster parents but denied formulating a plan or attempting suicide. At the time of the assessment, C.D. demonstrated increased volatility and dysregulation in her emotions. C.D. was also recommended to participate in individual trauma-based therapy.

¶ 8      In response to the motion to quash, respondent argued that the minors' testimony was "absolutely necessary" because they were the witnesses to the alleged abuse and would not corroborate each other.

¶ 9      At the hearing on respondent's motion to compel, the guardian informed the juvenile court that she needed to speak with the minors to determine whether they wanted to testify. She also wanted a therapist to offer an opinion on whether it is in the minors' best interest to testify regarding the alleged physical abuse. Respondent, through counsel, argued that the minors were the witnesses to the events and were "11 or 12," "not five, six years old." The court took the matter under advisement and later granted the minors' motion to quash. The court made the following findings on the record.

> "Traumatic events involving the girls brought this family into the system. They have already given statements. Their attorney reports it will cause them undue stress and trauma. They do have a history of suicidal ideations. They've witness[ed] substance misuse by the mother, multiple incidents of abuse involving these minors, as well as addressing the abuse of their siblings. Plus the fact that they are not in trauma therapy to even address these issues. So I do find and, of course, I can not sanction these minors for failure to testify. I do find that it is not

in their best interest to force them into court to testify. And the motion request will be granted to quash."

¶ 10    In January 2025, respondent filed a motion seeking to depose the minors. Before the start of the adjudicatory hearing, the parties discussed respondent's motion. The guardian argued that it was not in their best interest and none of the parties planned to call the minors to testify at the hearing. The State adopted the guardian's argument and objected to the motion. Respondent contended that the minors were witnesses to the event and were presumed competent. The juvenile court considered the parties' arguments and noted the "extensive trauma history" in the family. The court denied the motion, finding it was not in the best interest of the minors to have them sit for depositions. The parties then proceeded with the adjudicatory hearing.

¶ 11    Khalia Ross, a child protection advanced specialist with DCFS, testified that she was assigned to investigate the minors' case as the mandate worker. As the mandate worker, it was her job to see the children immediately as an emergency assignment. She met with the minors around noon on June 16, 2024, in the emergency room of Comer Children's Hospital. Ross first spoke with C.D. about an incident that occurred around 3 a.m. on June 16, 2024. C.D. told her that the minors had gone out with their older sister, and when they returned, respondent was not at home. Their sister stayed at the home with them until respondent returned around 3 a.m. After respondent started arguing with the older sister, the older sister left the home. Respondent then went into A.E.'s room and started saying "mean things," threw A.E.'s phone on the floor, and choked A.E. C.D. told Ross she had been staying with a temporary guardian and was visiting respondent. After respondent choked A.E., the older sister returned to the home and took the minors to a McDonald's. There, the minors met with the police and the temporary guardian.

¶ 12     Ross then spoke with A.E., who reported that she was in bed when respondent started "saying things to her, and then choked her." Respondent then made the minors leave the home. A.E. then went to McDonald's and later to the hospital. A.E. had also been living with a temporary guardian and had been visiting respondent for a week. Ross asked A.E. if she felt safe in respondent's care, and A.E. responded that she previously felt safe but did not feel safe after she had been choked. Ross also asked C.D. if she felt safe in respondent's care, and C.D. reported that she was usually safe but did not feel safe after the incident between respondent and A.E.

¶ 13     Ross spoke with both minors in the same room at the hospital, with A.E. in the bed and C.D. seated in the room. As part of her investigation, Ross spoke with Dr. Emily Jameyfield, a doctor at Comer Children's Hospital, who reported that A.E. had bruising in the upper side of her lip, but no other signs of injury.

¶ 14     Xena Sykes, a child protection trainee with DCFS, was assigned in June 2024 as a parallel worker and was not the primary worker on the case. Sykes was aware that respondent had prior indicated reports. On June 25, 2024, Sykes met in person with respondent in her home. Sykes explained to respondent the allegations that had been made against her. Respondent told Sykes that when she returned home, her older daughter was watching the minors. Respondent then went upstairs to the minors' bedroom. One of the minors, Sykes could not recall which minor, was on the phone with a boy. Respondent told the minor to give her the phone because she was not supposed to be on the phone. The minor began to cry and yell. The older sister entered the room and tried to deescalate the situation. Respondent told the older sister to "mind her business." Respondent stated that the older sister then left with the kids. Respondent ran after them but then returned home.

7

¶ 15    Sykes did not discuss whether respondent had other children in care or previous DCFS cases. Respondent told Sykes the minors were staying with a foster mom, but at that time, the minors were in the legal care and custody of respondent. Sykes asked respondent if she wanted to sign guardianship of the minors to the people with whom the minors had been staying, but respondent said no.

¶ 16    Joseph Mathew, a child protection investigator with DCFS, was assigned to investigate the minors' case on June 17, 2024. He learned that respondent had numerous prior indicated reports but did not know the exact number. During cross-examination by the guardian, Mathew agreed that there were 25 other investigations. Respondent was previously indicated for physical abuse of the siblings of the minors. Respondent's other children had been in DCFS care, but all were over 18 by the time of the hearing.

¶ 17    In this case, the allegations relating to A.E. included cuts, welts, bruises, and oral injuries, substantial risk of physical injury, and an environment injurious to health and welfare by neglect. For C.D., the allegations were for substantial risk of physical injury and environment injurious to health and welfare by neglect. The specific allegation was that respondent had been physical toward A.E. in the presence of C.D., in that respondent choked A.E. and told A.E. that respondent did not want her.

¶ 18    Mathew later spoke with respondent on the phone. He informed her that another person would be seeing her in person to talk about the allegations. Mathew was not present for the in-person visit. In a subsequent phone call, Mathew informed respondent that he would be looking into her prior history with DCFS. Respondent then told him that she did not choke A.E. She said the incident occurred because A.E. was on the phone and she wanted her daughter to attend a

family party on the Fourth of July. At the time of the incident, the minors were in the legal care and custody of respondent but were spending time outside of their mother's care.

¶ 19    Mathew took protective custody of the minors on July 3, 2024, because he believed the minors were at risk if returned to respondent's care. He based this belief on his review of the interviews and statements made by the minors, as well as prior concerns of respondent being physical and abusive to her older children. He also had concerns about respondent's mental health.

¶ 20    Following Mathew's testimony, the State entered several exhibits into evidence, including certified orders from prior child protection proceedings involving the minors and their siblings. In a previous certified order, the juvenile court had adjudicated A.E. and C.D. abused and neglected on November 21, 2013, finding that they were placed at a substantial risk of physical injury and exposed to an environment injurious to their welfare "because of [respondent's] temper, her excessive corporal punishment of [their] sibling [J.E.], previous finding of perpetrator of physical abuse and noncompliance with drug treatment." The juvenile court returned A.E. and C.D. to respondent's custody on October 5, 2016. Additional records disclosed an order granting private guardianship of the minors' older brother to another individual in 2014 and orders terminating respondent's parental rights of the minors' older sisters in 2017.

¶ 21    The State also presented the minors' school records. C.D.'s school records included a 2023 section 504 plan at school for accommodations, including those necessary for her prosthetic eye. A.E.'s school records included a referral for a psychological evaluation in 2022 to obtain additional information regarding A.E.'s "academic achievement," "functional performance," "communication status," and "social/emotional status."

¶ 22    Respondent testified that on June 16, 2024, her oldest daughter, age 27, took the minors out for dinner and a movie. Respondent returned home around 3 a.m., and her older daughter was watching television on the couch. Respondent then went upstairs to check on the minors. The minors have separate rooms. C.D. was sleeping in her room, but A.E. was on the phone with a boy in her room. Respondent had been trying to "ger her off the phone" with this same boy for several weeks. She told A.E. to get off the phone and to give respondent the phone. A.E. started to scream and yell that she did not want to give respondent the phone. Respondent reached over and grabbed the phone.

¶ 23    Following A.E.'s screaming, respondent's older daughter ran upstairs. Respondent told her daughter that she did not do anything to A.E., but her older daughter was not listening to her. Her older daughter told respondent to leave A.E. alone. Respondent and the older daughter started arguing, and then C.D. came into the room crying. At that time, A.E. was also crying while respondent argued with her older daughter. The older daughter then took the minors from the home. Respondent ran behind them asking that the minors come back home. A.E. tried to turn back and run home, but the older daughter grabbed her. According to respondent, C.D. was 12 years old and A.E. was 13 at the time of this incident. The record reflects that at the time this occurred A.E. was actually 14 years old. Respondent did not call the police.

¶ 24    Respondent admitted that she had other children who had been removed from her care. Her first son was removed from care after she "whooped" him for stealing. She was living in a shelter at that time, and the shelter reported the incident. She has had all 11 of her children removed from her care. The minors were previously removed from respondent's care with findings of abuse and neglect, and respondent was named the perpetrator.

¶ 25    Following arguments, the juvenile court found that the State had met its burden by a preponderance of the evidence for abuse based on a substantial risk of injury and neglect based on an injurious environment.

¶ 26    A dispositional hearing was conducted in April 2025. The only witness was Rhonda Davis, the caseworker for Lutheran Social Services of Illinois. She was assigned to the minors' case in July 2024. At the time of the hearing, A.E. was 14 and C.D. was 13. A.E. had been moved to a placement with a maternal cousin within the last week. When Davis placed A.E. in that home, it was safe and appropriate with no signs of abuse, neglect, or corporal punishment. A.E. was moved because her previous foster parent "was not conducive to her." Her foster parent was barely there, and A.E. was having issues at school. A.E. was in her fourth placement and was initially placed with C.D. She was moved following an incident in which A.E. could not find her charger and was beating on C.D.'s door. The foster parent tried to deescalate the situation, but another confrontation occurred. A.E. left the home and did not want to return. A.E. was then placed with an aunt, but the aunt said she could not do it anymore. Respondent then provided the name of a fictive kin, and A.E. was in that home from January until her recent move.

¶ 27    Following the recent move, A.E. will be switching schools and has an IEP. The new school was aware of the issues A.E. was having at her previous school. Due to the move in placement, A.E. will be assigned a new therapist. A.E.'s medical, dental, and vision need to be updated following her move.

¶ 28    C.D. was placed with fictive kin in Hoffman Estates and had been in this placement since the case began. The home was safe and appropriate, with no signs of abuse, neglect, or corporal punishment. C.D. recently had a bad day at school when she was refusing to participate. C.D. became upset because she did not want to be touched by the teachers, and "she had to be

11

deescalated." They were trying to create a plan to address this. C.D. was being assessed for services, including finding a therapy trauma center closer to her placement. At that time, C.D. was not engaged in any services. C.D. has anxiety and meeting new people can be triggering for her. C.D. has an IEP. Her medical, dental, and vision were up to date.

¶ 29    Respondent was allowed two hour supervised visits with the minors. Respondent had been assessed for services, including parenting, individual therapy, substance abuse, mental health assessment, domestic violence, anger management, and random urine drops. Respondent was referred for individual therapy, but Davis was not aware that respondent was participating. Respondent successfully completed her parenting class. Respondent declined domestic violence services because she did not have any domestic issues and was released from the program.

¶ 30    Davis testified that it was in the minors' best interests to be made wards of the court. This determination was made following a staff meeting with her supervisor. The minors should be made wards of the court because "they continue to need services and tried [*sic*] to meet their needs. And at this time the mother has not participated and has not met the minimal parenting standards in order to return the girls home."

¶ 31    At the conclusion of the hearing, the juvenile court judge held it was in the minors' best interests to be adjudged wards of the court. The court found that respondent was unable for some reason other than financial circumstances alone to currently care, protect, and/or discipline the minors. Appropriate services aimed at family preservation have not been successful, and the judge found it was in the minors' best interests to remove them from respondent's custody. The permanency order entered following the hearing indicated the goal was return home within 12 months.

¶ 32    This appeal followed.

12

¶ 33    Respondent first argues that the juvenile court's findings of abuse and neglect at the adjudicatory hearing were against the manifest weight of the evidence. Specifically, she contends there was no physical evidence to indicate that respondent choked A.E. and the trial court improperly relied on the uncorroborated statements of the minors to find the minors were abused or neglected. The guardian maintains that the trial court's findings were not contrary to the manifest weight of the evidence and the minors' out-of-court statements were corroborated. The State responds that the statements from A.E. and C.D. corroborated each other and were corroborated by the physical evidence. Further, the State asserts the juvenile court's findings were supported by the evidence of respondent's lengthy DCFS history, prior physical abuse of the minors' siblings, and her pattern of engaging in physical altercations with her children.

¶ 34    The Juvenile Court Act provides a two-step process the trial court must utilize to decide whether a minor child should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing, at which the court considers only whether the minor child is abused, neglected, or dependent. *Id.* ¶ 19; see 705 ILCS 405/2-18(1) (West 2024). If the circuit court determines the minor child is abused, neglected, or dependent at that hearing, then the court holds a dispositional hearing, in which the court determines whether it is consistent with the health, safety, and best interests of the minor child and the public for the minor child to be made a ward of the court. *A.P.*, 2012 IL 113875, ¶ 21; see 705 ILCS 405/2-22(1) (West 2024). In any proceeding brought under the Juvenile Court Act, including an adjudication of wardship, the paramount consideration is the best interest of the child. *A.P.*, 2012 IL 113875, ¶ 18.

¶ 35    It is the State's burden to prove allegations of neglect by a preponderance of the evidence, *i.e.*, that the allegations of neglect are more probably true than not. *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). In general, the trial court has broad discretion in its findings of fact

because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence. *In re M.D.*, 2021 IL App (1st) 210595, ¶ 25. We will not reverse a trial court's finding of neglect or abuse unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 36    The petitions for adjudication of wardship alleged that both of the minors were abused and neglected. Section 2-3 of the Act defines the circumstances under which a minor can be found "neglected" and/or "abused." See 705 ILCS 405/2-3 (West 2024). Here, the juvenile court found the minors to be neglected due to an environment that is injurious to the minors' welfare. *Id.* § 2-3(1)(b). "Neglect" has generally been defined as the failure of a responsible adult to exercise the care that circumstances justly demand. *M.D.*, 2021 IL App (1st) 210595, ¶ 24. Neglect is not limited to a narrow definition and encompasses both the willful and the unintentional disregard of duty. *A.P.*, 2012 IL 113875, ¶ 22. Neglect does not have a fixed and measured meaning, but rather, "[i]t takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.* The term "injurious environment" is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for his or her children. *M.D.*, 2021 IL App (1st) 210595, ¶ 24.

¶ 37    The court also found the minors were abused because respondent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2024). Actual injury is not required; it is sufficient if there is a substantial risk of physical injury. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35. The

same evidence that supports findings of abuse can also support findings of neglect. *In re J.R.*, 2022 IL App (1st) 221109, ¶ 36. Adjudications of abuse and neglect are reviewed based on the totality of the evidence. *Id.* ¶ 53.

¶ 38    The evidence presented at the adjudicatory hearing firmly established that the minors were neglected and abused. It is undisputed that the minors had gone out for the evening with their oldest sister and when they returned home, respondent was not there. Respondent arrived home around 3 a.m. When respondent went into A.E.'s room, an altercation occurred, and as a result, the minors left the home, contacted police, and went to the hospital. There was visible bruising on A.E.'s upper lip.

¶ 39    According to respondent, when she returned home, she found A.E. on the phone with a boy. Respondent tried to take A.E.'s phone, but A.E. yelled and refused to give respondent the phone. Respondent reached over to take the phone. C.D. came into the room and was crying, and A.E. started crying as well. After hearing the argument, the older sister came upstairs and took the minors from the home. Respondent denied choking A.E.

¶ 40    DCFS mandate worker Ross testified that she met with the minors while A.E. was being treated at the hospital. Both of the minors reported that respondent choked A.E. A.E. told Ross that respondent came into her room and said "mean things" to her. C.D. reported she heard respondent tell A.E. that respondent wished A.E. had never been born. Respondent then put the minors out of the home. The minors told Ross that they did not feel safe with respondent.

¶ 41    The evidence also showed respondent had been the subject of 25 DCFS investigations, including findings that respondent physically abused the minors' older brother, excessive corporal punishment of the minors' oldest sister, respondent's anger issues, and her substance abuse. All 11 of respondent's children had been removed from her care, and her parental rights

15

were terminated for 3 of her children. Pursuant to the Juvenile Court Act, section 2-18(3) provides that the "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2024). The minors at issue were previously found abused and neglected when they were aged three and one and were later returned to respondent's care when they were five and three. A.E. was born with marijuana in her system. Both minors were on IEPs due to developmental and emotional issues. Despite respondent having legal custody of them, both minors reported that they were not living with respondent at the time of the incident but had been visiting for a week.

¶ 42    Respondent contends that this evidence was insufficient to support the trial court's findings. She first argues that there was no physical evidence indicating that she choked A.E. We note respondent fails to cite any authority supporting her contention that physical evidence was required to establish the allegations of abuse and neglect. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires appellant's brief to include an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." It is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). Thus, respondent has forfeited this argument.

¶ 43    Forfeiture aside, respondent's assertion that physical evidence was required is contradicted by well-established authority. First, the relevant allegation of abuse under the Juvenile Court Act requires "a *substantial risk* of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional

health, or loss or impairment of any bodily function." (Emphasis added.) 705 ILCS 405/2-3(2)(ii) (West 2024); see *A.S.*, 2020 IL App (1st) 200560, ¶ 35 (finding that no proof of injury is required under the statute). Illinois courts have consistently held "all that is needed to substantiate a finding of legal neglect and abuse under statutory terms is proof by a preponderance of the evidence of an injurious *environment* or substantial *risk* of harm." (Emphases in original and internal quotation marks omitted.) *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39. "And, again, our courts have made clear that we need not wait until a child becomes a victim of physical abuse or permanent emotional damage before such a finding may be upheld." *Id.* Thus, the juvenile court was not required to find physical evidence of injury as a result of respondent's choking of A.E.

¶ 44 Respondent further asserts that the minors' reporting of the incident was not corroborated and, therefore, the evidence was insufficient to support the claims of neglect and abuse. Specifically, she contends that the DCFS witnesses provided testimony about what occurred after the fact. Ross interviewed the minors in the hospital while both were in the room, while Sykes and Mathew investigated the report. The error in respondent's argument is that she focuses solely on the corroboration of the minors' statements regarding the altercation with A.E. but fails to acknowledge the additional evidence that supports the findings of neglect and abuse.

¶ 45 The Juvenile Court Act has carved out an exception for statements from minors: "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2024). While the term "corroboration" is not defined in the Juvenile Court Act, the supreme court "has explained that there must be 'independent evidence which would

support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred.' " *In re Jeh. R.*, 2023 IL App (1st) 230006, ¶ 64 (quoting *In re A.P.*, 179 Ill. 2d 184, 199 (1997)). "Whether sufficient corroboration exists is determined on a case-by-case basis." *In re Z.C.*, 2022 IL App (1st) 211399, ¶ 43. The corroborating evidence does not need to prove the abuse happened, but rather it adds weight or credibility to the minors' out-of-court statements. *Id.* ¶ 51. Further, reviewing courts have found the out-of-court statements of one minor sufficient to corroborate the hearsay statements of another minor. See *Jeh. R.*, 2023 IL App (1st) 230006, ¶ 68; *Z.C.*, 2022 IL App (1st) 211399, ¶ 48; *In re J.L.*, 2016 IL App (1st) 152479, ¶ 92; *In re Alexis H.*, 401 Ill. App. 3d 543, 561 (2010); *In re K.O.*, 336 Ill. App. 3d 98, 109 (2002).

¶ 46    Here, both A.E. and C.D. reported that respondent choked A.E. after an argument. Immediately following this incident, the minors went to the hospital and bruising was observed on A.E.'s upper lip. While at the hospital, Ross first interviewed C.D. who recounted respondent's attack on A.E. Then Ross interviewed A.E. As discussed above, both minors detailed respondent arriving home, saying "mean things" to A.E., trying to take A.E.'s phone, and ultimately choking A.E. Both minors sufficiently corroborated each other. To the extent respondent asserts that the minors were required to be interviewed separately, she cites no relevant authority to support this assertion. Moreover, this court previously rejected this claim. See *Jeh. R.*, 2023 IL App (1st) 230006, ¶ 68 ("This court finds no support for [the mother's] contention that the minors must be interviewed separately for their statements to corroborate each other or that the witnesses' testimonies that both minors reported various incidents of abuse and neglect was insufficient.").

¶ 47    Based on the record before us, including the minors' statements and respondent's

extensive history of neglect and abuse of her children, we find that the trial court's findings that A.E. and C.D. were neglected and abused were not against the manifest weight of the evidence. See 705 ILCS 405/2-18(3) (West 2024).

¶ 48     Respondent next contends that the juvenile court abused its discretion when it denied her motion to compel the minors to testify during the adjudicatory hearing. Both the guardian and the State respond that the court properly denied the motion because the minors did not wish to testify and had an extensive history of trauma as well as emotional, behavioral, and mental health concerns.

¶ 49     The policy of the Juvenile Court Act "shall be administered in a spirit of humane concern." *Id.* § 1-2(2). It is within the juvenile court's discretion to compel the appearance of a party at trial. *In re J.C.*, 2019 IL App (1st) 182226, ¶ 38; *In re Mark W.*, 383 Ill. App. 3d 572, 589-90 (2008). The court's power to compel a party to appear should only be exercised for good cause and in such a manner that a party may not be subject to harassment, oppression, or hardship. *Mark W.*, 383 Ill. App. 3d at 590 (citing *Pickering v. Owens-Corning Fiberglas Corp.*, 265 Ill. App. 3d 806, 816 (1994)). "Proceedings under the Juvenile Court Act are not intended to be adversarial; rather, the paramount consideration is the best interest of the child." *J.C.*, 2019 IL App (1st) 182226, ¶ 38. This court will not find an abuse of discretion unless the lower court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court. *Id.*

¶ 50     Respondent asserts the minors would not have been subjected to harassment, oppression, or hardship if the juvenile court had compelled them to appear at the adjudicatory hearing. According to respondent, she was restricted from meaningfully participating in the proceedings

when the court denied her requests to question the minors. She notes that the minors were 13 and 14 years old at the time of the hearing.

¶ 51    However, respondent fails to address the evidence in the record documenting the minors' history with DCFS, including the instance at issue, as well as the minors reported mental health concerns, including their collective trauma, emotional issues, and suicidal ideation. Illinois courts have repeatedly held that, in proceedings under the Juvenile Court Act, the trial court has discretion to prevent parents from compelling their minor children to testify if the court finds that testifying is not in the children's best interests. See *id.* ¶ 45 (trial court did not abuse its discretion in denying mother's request to have nine-year-old child testify at termination proceedings); *J.L.*, 2016 IL App (1st) 152479, ¶ 108 (finding no abuse of discretion by the trial court in denying the father's request to have minor testify at adjudicatory hearing in light of the minor's mental health issues and relative stability at that time); *In re A.W.*, 397 Ill. App. 3d 868, 874 (2010) (trial court did not abuse its discretion in preventing the mother from calling her 15-year-old son as a witness at a best interest hearing based on evidence that requiring the son to testify would be detrimental to his best interest); *Mark W.*, 383 Ill. App. 3d at 589-90 (finding no abuse of discretion in denying plenary guardian's request to have minor testify when the minor's therapist indicated that his appearance in court could affect his therapeutic progress). As the reviewing court in *A.W.* observed, "We can only imagine the stress and pressure placed on children that are requested to testify in this setting, the impact of which will undoubtedly affect them long-term. We simply cannot know the detrimental effects caused by placing a child in such a situation." *A.W.*, 397 Ill. App. 3d at 874.

¶ 52    Here, the record on appeal details the emotional issues of both minors. Both girls have experienced significant trauma dating back to infancy and continue to demonstrate these issues.

The minors were removed from respondent's care when they were toddlers following a physical altercation between respondent and their older sister. Later, C.D. battled cancer and lost an eye. Both minors were assessed for needing individual trauma therapy based on their unstable relationship with respondent, including respondent's substance abuse, witnessing the physical abuse of their siblings, and extensive history with DCFS. Significantly, the minors did not wish to testify in this case. "[T]he paramount consideration in proceedings under the Juvenile Court Act is the best interest of the child, not that of the mother." *J.C.*, 2019 IL App (1st) 182226, ¶ 45. The record fully supports the trial court's finding that it was not in the best interest of the minors to be compelled to testify or provide depositions. In light of the well-documented mental health issues and trauma endured by the minors, the trial court did not abuse its discretion in denying respondent's request to compel the appearance of the minors at the adjudicatory hearing.

¶ 53    Based on the foregoing reasons, we affirm the decision of circuit court of Cook County.

¶ 54    Affirmed.

***In re A.E.*, 2026 IL App (1st) 250918**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 24-JA-477, 24-JA-478; the Hon. Andrea M. Buford and the Hon. Audrey Cosgrove, Judges, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Kelly Y. Baker, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), for other appellees. |